## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **UPPI, LLC,** *and* **IONSOUTH-MOBILE, LLC** *f/k/a* **COX NUCLEAR PHARMACY** *d/b/a* **IONSOUTH DIAGNOSTIC PHARMACY LLC,** *on behalf of itself and others similarly situated,*<br>        **Plaintiffs,**<br><br>v.<br><br>**JUBILANT DRAXIMAGE INC.** *d/b/a* **JUBILANT RADIOPHARMA,**<br>        **Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>) **CIVIL ACTION NO. 1:19-00518-KD-N**<br>)<br>)<br>)<br>)<br>)<br>) |

## REPORT AND RECOMMENDATION

This action is before the Court on the motion to dismiss under Federal Rule of Civil Procedure 12(b) (Doc. 35), with separate supporting memorandum (Doc. 36) and exhibit (Doc. 34 *SEALED*), filed by the Defendant, Jubilant Draximage Inc. d/b/a Jubilant Radiopharma ("JDI"). The assigned District Judge has referred said motion to the undersigned Magistrate Judge for appropriate action under 28 U.S.C. § 636(a)-(b), Federal Rule of Civil Procedure 72, and S.D. Ala. GenLR 72(a). *See* S.D. Ala. GenLR 72(b); (2/9/2020 electronic reference).

In accordance with the Court's briefing schedule (*see* Docs. 38, 45, 52), the Plaintiffs, UPPI, LLC ("UPPI") and Ionsouth-Mobile, LLC f/k/a Cox Nuclear Pharmacy d/b/a Ionsouth Diagnostic Pharmacy LLC ("Ionsouth"), filed a response (Doc. 50) in opposition to the motion, which includes an embedded alternative request for leave to amend the complaint under Federal Rule of Civil Procedure 15(a)(2) in the event the motion to dismiss is not denied (*id.*, PageID.331). JDI timely filed a reply to the response (Doc. 53), and the Plaintiffs timely filed a

sur-reply to the reply (Doc. 54). The motion is now under submission (*see* Doc. 52) and is ripe for disposition.

Upon consideration, and for the reasons explained herein, the undersigned will recommend that the Court (1) grant in part and deny in part JDI's motion to dismiss (Doc. 35), and (2) deny the Plaintiffs' request for leave to amend the complaint.

## I.   *Applicable Legal Standards*

JDI's motion largely requests that the complaint be dismissed under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. However, JDI also argues that one of the counts in the complaint should be dismissed for lack of standing under Article III of the U.S. Constitution, which is more appropriately brought as a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).[1]

### a.   Rule 12(b)(6) Standards

In deciding a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, a court must "accept the allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1262 (11th Cir. 2015). "[G]enerally, the existence of an affirmative defense will not support a rule 12(b)(6) motion to dismiss for failure to state a claim. A district court, however,

---

[1] *See Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008) (per curiam) (" ' Because standing is jurisdictional, a dismissal for lack of standing has the same effect as a dismissal for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1).' " (quoting *Cone Corp. v. Fla. Dep't of Transp.*, 921 F.2d 1190, 1203 n.42 (11th Cir. 1991)).

may dismiss a complaint on a rule 12(b)(6) motion when its own allegations indicate the existence of an affirmative defense, so long as the defense clearly appears on the face of the complaint." *Fortner v. Thomas*, 983 F.2d 1024, 1028 (11th Cir. 1993) (quotation omitted)).

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.' … [T]he pleading standard Rule 8 announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.   A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (citations and some quotations omitted). *See also Duty Free Americas*, 797 F.3d at 1262 (Courts " 'afford no presumption of truth to legal conclusions and recitations of the basic elements of a cause of action.' " (quoting *Franklin v. Curry*, 738 F.3d 1246, 1248 n. 1 (11th Cir. 2013) (per curiam))).

> "To survive a motion to dismiss [for failure to state a claim], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). In other words, the complaint must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

*Hi-Tech Pharm., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1196 (11th Cir. 2018).

"The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citation and quotation marks omitted). Put another way, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show [n]'—'that the pleader is entitled to relief.' " *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

Moreover, " 'the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.' " *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting *Iqbal*, 556 U.S at 678). *Iqbal* "suggested that courts considering motions to dismiss adopt a 'two-pronged approach' in applying these principles: 1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.' " *Id.* (quoting *Iqbal*, 556 U.S. at 679). "Importantly, … courts may infer from the factual allegations in the complaint 'obvious alternative explanation[s],' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Id.* (quoting *Iqbal*, 556 U.S. at 679 (quoting *Twombly,* 550 U.S. at 567)).

### b.      Rule 12(b)(1) Standards

> Attacks on subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) come in two forms. 'Facial attacks' on the complaint require the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion. 'Factual attacks,' on the other hand, challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered.

*Lawrence v. Dunbar*, 919 F.2d 1525, 1528–29 (11th Cir. 1990) (per curiam) (citation and quotations omitted). Here, JDI's Rule 12(b)(1) motion is a "facial attack" on the complaint, as it does not rely on matters outside of the complaint. Therefore, the Plaintiffs are "afforded safeguards similar to those provided in opposing a Rule 12(b)(6) motion—the court must consider the allegations of the complaint to be true."   *Id*. at 1529.

### II.      *Summary of Well-Pleaded Factual Allegations*

Nuclear medicine is a branch of medicine that allows physicians to identify, diagnose, and treat medical conditions by introducing small amounts of radioactive material into patients' bodies. Radiopharmaceuticals are a class of low-level radioactive medicines used for both diagnostic and therapeutic purposes. Diagnostic radiopharmaceutical products are typically used in conjunction with imaging devices to scan vital organs; therapeutic radiopharmaceutical products can be used, for example, to treat certain cancers. Many radiopharmaceuticals are compounded products composed of a nonradioactive element, known as a ligand or reagent, combined or "radiolabeled" with a radioisotope, most commonly Technetium ("$Tc^{99m}$"). A "cold kit" contains the non-radioactive ligand but, at the time of manufacture and sale, has not yet been radiolabeled or "tagged" with any

radioactive material. There are also non-compounded radiopharmaceuticals referred to as "hot" products, which are manufactured and sold already containing radioactive material.   (Doc. 1, PageID.2, 12, ¶¶ 1 – 2, 38).

JDI is one of the largest radiopharmaceutical manufacturers in the United States, manufacturing a number of radiopharmaceutical products, including both "cold kits" and "hot" products. (*Id.*, PageID.3, ¶ 3). Five of those products are at issue in this lawsuit:

| SOLE-SOURCE PRODUCTS (available in U.S. only from JDI) | PRODUCT TYPE | USES |
|---|---|---|
| MAA | Cold kit | Used to prepare $Tc^{99m}$ Macro-aggregated Albumin Injection, a lung imaging agent |
| DTPA | Cold kit | Used to prepare $Tc^{99m}$ pentetate injection, a multi-purpose renal and lung imaging agent |
| **MULTI-SOURCE PRODUCTS (available in U.S. from JDI and other mfrs.)** | **PRODUCT TYPE** | **USES** |
| MDP-25 ("MDP") | Cold kit | Used to prepare $Tc^{99m}$ Medronate, a bone imaging agent |
| Sestamibi | Cold kit | Used to prepare $Tc^{99m}$ Sestamibi, a heart imaging agent |
| Sodium Iodine I-131 (marketed by JDI as HICON®) | Hot product | Sodium Iodine I-131 solution for treatment of thyroid conditions |

(*Id.*).

Unlike traditional retail drug manufacturers, radiopharmaceutical manufacturers do not sell products to retail pharmacies in a form that can be dispensed directly to a patient.   Instead, radiopharmaceutical manufacturers sell the radioactive and non-radioactive components separately to specialized nuclear pharmacies, such as Ionsouth, that prepare patient-ready doses. When a healthcare

provider needs to perform a medical procedure or test that requires a certain radiopharmaceutical, the provider places an order for the radiopharmaceutical with a nuclear pharmacist who then prepares a dose of the medicine. Nuclear pharmacies purchase radiopharmaceutical products from JDI and other manufacturers. Nuclear pharmacies can be either independently owned, like Ionsouth, or part of a corporate-owned network. UPPI, also known as United Pharmacy Partners, is the largest association of independent and institutional nuclear pharmacies in the United States, counting over 70 independent nuclear pharmacies, including Ionsouth, as members. (*Id.*, PageID.3, 9 15, ¶¶ 4-5, 26, 48).

In 2013, JDI acquired two approved new drug applications from Pharmalucence, Inc.: NDA 017776, the new drug application for Pulmolite, a competing cold kit to JDI's MAA; and NDA 017714, the new drug application for AN-DTPA, a competing cold kit to JDI's DTPA (hereinafter collectively referred to as "the NDAs"). JDI acquired the NDAs despite substantial interest from other buyers who sought to launch products to compete with JDI's MAA and DTPA cold kits. After purchasing the NDAs, JDI "warehoused" them—refusing to either offer new products that would compete with its MAA and DTPA cold kits, or to license or sell the NDAs to another competitor that could do so. Then, in February 2014, JDI announced significant price increases for MAA and DTPA cold kits. For nuclear pharmacies like Ionsouth, the price of a vial of MAA rose from $22 to $400, a 1718% increase; the price of a vial of DTPA rose from $22 to $138, a 527% increase. Since 2014, JDI has continued to raise the price of these products. (*Id.*, PageID.5, ¶¶ 11 – 13).

In May 2017, a JDI affiliate, Jubilant DraxImage Radiopharmacies Inc., purchased Triad Isotopes, Inc., the second-largest network of nuclear pharmacies in the United States, thus acquiring over 50 nuclear pharmacies which directly compete with Ionsouth. On June 17, 2019, JDI's parent company, Jubilant Pharma Limited ("JPL"), announced that the Triad Isotope nuclear pharmacy business would be integrated with JDI's radiopharmaceutical manufacturing business as a single company: Jubilant Radiopharma (JDI's nuclear pharmacy division, hereinafter referred to as "Triad Isotopes").   (*Id.*, PageID.4, 11, ¶¶ 6, 31).

Beginning in 2017, JDI initiated additional anticompetitive practices "rooted in" its Master Supply and Distribution Agreement ("JDI Master Agreement"). First, a nuclear pharmacy's purchase of MAA and DTPA kits is conditioned on that pharmacy also purchasing a guaranteed minimum amount of other JDI products. Second, JDI nuclear pharmacy customers are prohibited from selling or distributing JDI products to other nuclear pharmacies. Third, nuclear pharmacists are forbidden from "fractionating" JDI's products.[2] Fourth, to enforce its restriction on reselling and its prohibition on fractionating, JDI has adopted a mandatory auditing program which JDI has utilized to review its customers' records and monitor how they

---

[2] " 'Fractionating' involves reconstituting the contents of a cold kit with saline and dividing portions of the reconstituted kit into other containers for storage and subsequent radiolabeling. Because a single cold kit can produce multiple doses of a radiopharmaceutical, fractionating enables a nuclear pharmacist to preserve excess cold kit material for use at a later date." (Doc. 1, PageID.6-7, ¶ 18). "Fractionation also provides nuclear pharmacists with an optimal way to handle unscheduled emergency requests for preparation of a radiopharmaceutical received outside of normal business hours." (*Id.*, PageID.19, ¶ 61).

dispense their products, which can expose competitively sensitive information to JDI. (Doc. 1, PageID.6-7, ¶¶ 15-19; Doc. 3, PageID.68-69, ¶¶ 15-19).[3]

### III.   *Causes of Action*

Based on the foregoing well-pleaded allegations, as well as others, the Plaintiffs assert the following causes of action against JDI:

- Count I – monopolization of MAA and DTPA markets in violation of § 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.[4]

- Count II – engaging in an unlawful tying arrangement[5]  in violation of § 1 of

---

[3] The Plaintiffs' initial complaint (Doc. 1) was filed with certain provisions redacted. The Plaintiffs' also requested, and were granted, leave to file an unredacted copy of the complaint (Doc. 3) under seal, on the grounds that the unredacted complaint contained "proprietary, confidential and highly sensitive" information regarding the JDI Master Agreement. (*See* Docs. 2, 10). The undersigned has endeavored to cite to the publicly available, redacted version of the complaint (Doc. 1) whenever possible in this recommendation. Citations to the sealed, unredacted version of the complaint (Doc. 3) are made where provisions unreadable in the redacted version of the complaint (Doc. 1) are necessary to address issues raised in the parties' briefs. In most such instances, one of the parties has either quoted directly a redacted portion of the complaint or described its substance, or the provision's substance can otherwise be gleaned from the parties' briefing. No party has requested leave to redact or seal their present briefing, nor has any party complained that a brief reveals sensitive information.

[4] "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony…" 15 U.S.C. § 2.

[5] "A tie is an arrangement under which a seller agrees to sell one product, the tying product, only on the condition that the buyer also purchase a second product, the tied product." *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 711 (11th Cir. 1984) (per curiam).

the Sherman Act, 15 U.S.C. § 1,[6] and Section 3 of the Clayton Action, 15

U.S.C. § 14.[7]

- <u>Count III</u> – Monopolization of MDP and Sodium Iodine I-131 markets, in

  violation of § 2 of the Sherman Act.

- <u>Count IV</u> – Attempted monopolization of MDP, Sestamibi, and Sodium Iodine

  I-131 markets, in violation of § 2 of the Sherman Act.

- <u>Count V</u> – Contracting in restrain of trade, in violation of § 1 of the Sherman

  Act and § 3 of the Clayton Act.[8]

---

[6] "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony…" 15 U.S.C. § 1.

[7] "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C. § 14

[8] None of the Plaintiffs' antitrust counts explains why they are entitled to bring a private civil right of action based on these criminal antitrust statutes. Nevertheless, "[s]ection Four of the Clayton Act creates a private right of action for '… any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor …, and shall recover threefold the damages by him sustained.' " *Sunbeam Television Corp. v. Nielsen Media Research, Inc.*, 711 F.3d 1264, 1270 (11th Cir. 2013) (quoting 15 U.S.C. § 15(a)). *Cf. id.* n.15 ("In its brief, Sunbeam never cites this statutory mechanism upon which it bases its

- <u>Count VI</u> – Unjust enrichment.

Ionsouth also proposes to represent a class of similarly situated nuclear pharmacies in bringing the foregoing causes of action.[9]

## IV.  *Analysis*

JDI argues that the complaint is due to be dismissed for a host of reasons, which the undersigned finds appropriate to address in an order different from that presented in the motion to dismiss.

---

treble damages claim. It relies, instead, upon cases under Section Two of the Sherman Act, 15 U.S.C. § 2. That reliance alone, is not enough to establish civil liability for a private plaintiff. *Cable Holdings of Ga., Inc. v. Home Video, Inc.*, 825 F.2d 1559, 1562 (11th Cir. 1987) (where '[a]n antitrust plaintiff must show that he has been damaged and that the antitrust violation alleged is the cause of his injury'). The 'business or property' requirement of Section Four of the Clayton Act helps prevent entirely remote or speculative claims." (quotation omitted)).

[9] "In a given case, a federal district court must have at least one of three types of subject matter jurisdiction: (1) jurisdiction under a specific statutory grant; (2) federal question jurisdiction pursuant to 28 U.S.C. § 1331; or (3) diversity jurisdiction pursuant to 28 U.S.C. § 1332[]." *Baltin v. Alaron Trading Corp.*, 128 F.3d 1466, 1469 (11th Cir. 1997). As the Plaintiffs correctly allege (see Doc. 1, PageID.11, ¶ 32), this Court has original jurisdiction over the Plaintiffs' federal antitrust claims in Counts I through V under the Clayton Act's specific statutory grants of jurisdiction, *see* 15 U.S.C. §§ 15(a), 26, as well as under 28 U.S.C. § 1331 (federal question) and § 1337(a) ("The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies…"). The Plaintiffs do not allege the existence of either ordinary diversity jurisdiction under 28 U.S.C. § 1332(a), or Class Action Fairness Act jurisdiction under § 1332(d), that would permit the Court to exercise original jurisdiction over the state law claim in Count VI. Nevertheless, the Court exercises supplemental jurisdiction over that claim under 28 U.S.C. § 1367(a), as it is so related to the claims over which the Court has original jurisdiction that it "form[s] part of the same case or controversy under Article III of the United States Constitution."

### a.      Article III Standing

"Although the Constitution does not fully explain what is meant by '[t]he judicial Power of the United States,' Art. III, § 1, it does specify that this power extends only to 'Cases' and 'Controversies,' Art. III, § 2." *Spokeo, Inc. v. Robins*, -- U.S. --, 136 S. Ct. 1540, 1547, 194 L. Ed. 2d 635 (2016), *as revised* (May 24, 2016). "And ' "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." ' " *Id.* (quoting *Raines v. Byrd*, 521 U.S. 811, 818, 117 S. Ct. 2312, 138 L. Ed. 2d 849 (1997))). "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Id.*

> To establish Article III standing, a prerequisite to invoking federal jurisdiction, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. ——, 136 S. Ct. 1540, 1547, 194 L. Ed. 2d 635 (2016). "When the defendant challenges standing via a motion to dismiss, 'both ... trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.' " *Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 806 (11th Cir. 1993) (quoting *Warth v. Seldin*, 422 U.S. 490, 501, 95 S. Ct. 2197, 2206, 45 L. Ed. 2d 343 (1975)). But even at the pleading stage, "a plaintiff must 'clearly allege facts demonstrating each element,' and we evaluate standing on a motion to dismiss based on the facts alleged in the complaint." *Aaron Private Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1336 (11th Cir. 2019) (internal citation omitted) (quoting *Spokeo*, 136 S. Ct. at 1547).

*Tokyo Gwinnett, LLC v. Gwinnett Cty., Ga.*, 940 F.3d 1254, 1262 (11th Cir. 2019).

To establish Article III standing, an injury in fact "must be concrete, particularized, and actual or imminent…" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 133 S. Ct. 1138, 185 L. Ed. 2d 264 (2013) (quotation omitted). "A 'concrete' injury must be '*de facto*'; that is, it must actually exist, as opposed to being hypothetical or speculative. A concrete injury need be only an identifiable trifle." *Salcedo v. Hanna*, 936 F.3d 1162, 1167 (11th Cir. 2019) (citations, quotations, and footnote omitted). "An injury in fact must also be particularized, that is, affecting the plaintiff 'in a personal and individual way.' " *Id.* n.3 (quoting *Spokeo*, 136 S. Ct at 1548).[10] As to imminence, a "threatened injury must be *certainly impending* to constitute injury in fact, and … allegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409 (quotations omitted).

Count V alleges that the JDI Master Agreement is an unlawful contract in restraint of trade because it "allowed JDI to (a) restrict Ionsouth and members of the class from selling JDI products to other nuclear pharmacies; (b) prohibit Ionsouth and members of the Class from fractionating JDI products; and (c) conduct highly invasive audits." (Doc. 3, PageID.111-112, ¶ 198). JDI argues that Count V is due to be dismissed for lack of Article III standing because the Plaintiffs have failed to plausibly allege an injury in fact from these provisions. With regard to the prohibitions on resale and fractionation, JDI argues that "the Complaint nowhere alleges that IonSouth engaged in either resale or fractionating prior to entering into

---

[10] "As the would-be class representative, [Ionsouth] must establish [its] own personal, concrete injury notwithstanding whatever injuries may have been suffered by the other members of the class." *Salcedo*, 936 F.3d at 1167 n.3

the JDI Master Agreement, or that it would engage in these practices were they not prohibited." (Doc. 36, PageID.242). As for the audit requirement, JDI argues that, while the Plaintiffs allege "that the audits provide JDI with competitively sensitive information that would be of great value to Triad and could be used to harm its competitors," they do "not allege that JDI actually <u>has</u> provided any competitively sensitive information to Triad pursuant to the audit provision, which would have been necessary for Triad to compete unfairly against other nuclear pharmacies[,]" nor have the alleged "that IonSouth has ceased operations because of any audit." (*Id.*, PageID.243).

As to an injury in fact due to the fractionation prohibition, the Plaintiffs point to their allegation that, "[b]y prohibiting its customers from fractionating, JDI requires them to purchase more cold kit product than they need and prevents them from efficiently using the JDI products that they buy." (Doc. 3, PageID.69, ¶ 18). In reply, JDI claims in that the complaint does not allege that "that IonSouth did or otherwise would engage in those practices…" (Doc. 53, PageID.352). However, the complaint also alleges (albeit in Count VI instead of Count V) that "JDI has knowingly accepted and retained a financial benefit by prohibiting Ionsouth and members of the Class from fractionating its products[,]" and that "[b]y interfering with this standard practice of nuclear pharmacy, Ionsouth and members of the Class had to purchase more JDI cold kits than they needed or desired." (Doc. 3, PageID.113, ¶ 205). Construed in the light most favorable to the Plaintiffs, these allegations allow for the reasonable inference that Ionsouth did in fact engage in the

practice of fractionation, and was therefore harmed by the fractionation prohibition in the JDI Master Agreement. Moreover, accepting these allegation as true, the undersigned finds that they plausibly allege that IonSouth suffered an injury in fact from the fractionation prohibition – specifically, by being required to spend more money on JDI products than it otherwise would if it was permitted to fractionate. Additionally, this injury is fairly traceable to the JDI Master Agreement, and is likely to be redressed by a favorable decision from the Court.

As to an injury in fact due to the audit requirement, the Plaintiffs point to their allegation that, "[f]or at least months prior to auditing Plaintiff Ionsouth, Triad Isotopes' Southeast Regional Director of Operations, C.H. Reilly III, repeated to employees on multiple occasions, in person, that JDI was going to pursue Ionsouth using the audit mechanism[,]" and that it "was also mentioned multiple times on conference calls that JDI was planning on using an audit to try to shut-down Ionsouth." (Doc. 3, PageID.101, ¶ 144). In reply, JDI claims that this allegation only shows "an *attempted* shut-down" that only "*might* result" in injury to Ionsouth, making the injury overly speculative. (Doc. 53, PageID.353). However, accepting those allegations as true and construing them in the light most favorable to the Plaintiffs, the undersigned finds that the complaint plausibly alleges an imminent injury in fact. By alleging specific facts indicating that JDI made concrete plans to use the audit provision as a tool to harm Ionsouth to the point of causing it

to shut down, the Plaintiffs have plausibly alleged a "threatened injury" that is "certainly impending."[11]

The Plaintiffs' response brief acknowledges JDI's arguments challenging their Article III standing to challenge the resale prohibition, but the Plaintiffs do not substantively address those arguments until their sur-reply. Nevertheless, the complaint does allege that this provision "forecloses Ionsouth from acquiring JDI Sole-Source or Multi-Source Products from alternative sources[,]" thus "prevent[ing] nuclear pharmacies, like Ionsouth and members of the Class, from purchasing Sodium Iodine I-131, MDP, and Sestamibi from other radiopharmaceutical manufacturers at lower prices[ and] forcing them to pay JDI's supra-competitive prices." (Doc. 3, PageID.96, 103, ¶¶ 126, 151). Accepting these allegation as true, the undersigned finds that they plausibly allege that IonSouth suffered an injury in fact from the resale prohibition – specifically, by being required to spend more money

---

[11] The cases that JDI relies on to dismiss this allegation as overly speculative are distinguishable and not otherwise persuasive on the issue. In *Tokyo Gwinnett*, the Eleventh Circuit Court of Appeals found that allegations of "past 'bad faith' efforts to thwart [the plaintiff]'s business" were "wholly abstract" injuries that "do not provide the kind of particular, direct, and concrete injury that is necessary to confer standing to sue in the federal courts[,]" concluding that the plaintiff's "s perception that the [defendant] acted in bad faith isn't a cognizable Article III injury; it's simply an allegation regarding the [defendant]'s motives." 940 F.3d at 1263 (quotation omitted). Here, on the other hand, the Plaintiffs allegations go beyond speculative bad faith, citing to actual statements from JDI affiliates indicating that JDI actually planned to use the audit provision to harm Ionsouth. As for *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983), that case did not concern Article III injury in fact, but rather statutory standing under antitrust laws, an issue which will be discussed later. *See Sunbeam Television Corp. v. Nielsen Media Research, Inc.*, 711 F.3d 1264, 1270 (11th Cir. 2013) ("Antitrust standing requires that a party must do more than meet the basic 'case or controversy' or 'injury in fact' required by Article III of the Constitution.").

buying JDI products directly from JDI than it would have buying them from other JDI consumers. Additionally, this injury is fairly traceable to the JDI Master Agreement, and is likely to be redressed by a favorable decision from the Court. Thus, Ionsouth has sufficiently alleged that it has Article III standing to bring its Count V claims.

"An association … has standing to sue on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1327 (11th Cir. 2014) (quotation omitted). "The first requirement of associational standing is that at least one member meets the three requirements of individual standing." *Sierra Club v. Tennessee Valley Auth.*, 430 F.3d 1337, 1344 (11th Cir. 2005). Here, at least one member of UPPI, Ionsouth, has standing to sue in its own right on the Count V claims. Moreover, JDI does not challenge the other two requirements of UPPI's associational standing, and the undersigned finds that those requirements are also met.

Accordingly, JDI's motion to dismiss is due to be denied to the extent it argues lack of Article III standing to bring Count V.

### b.    Antitrust Standing

A private plaintiff seeking damages under the antitrust laws must establish standing to sue. *Fla. Seed Co.*[ *v. Monsanto Co.*]*,* 105 F.3d [1372,] 1374[ (11th Cir. 1997)]. Antitrust standing requires that a party must do more than meet the basic "case or controversy" or "injury in

fact" required by Article III of the Constitution. *Id.,* citing *Todorov v. DCH Healthcare Auth.,* 921 F.2d 1438, 1448 (11th Cir. 1991). The doctrine of antitrust standing reflects prudential concerns and is designed to avoid burdening the courts with speculative or remote claims. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 103 S. Ct. 897, 912, 74 L. Ed. 2d 723 (1983). Antitrust standing is a conscientious method to find the proper private plaintiff to enforce the antitrust laws.

…In order to recover treble damages, Section Four [of the Clayton Act] requires that a private plaintiff enforcing the antitrust laws must establish both: (1) that the plaintiff has standing; and, (2) that the defendant has violated the antitrust laws. *See Levine v. Cent. Fl. Med. Affiliates,* 72 F.3d 1538, 1545 (11th Cir. 1996).

Antitrust standing, however, is narrower than the broad language of the statute indicates. *Associated Gen. Contractors,* 103 S. Ct. at 907. The Supreme Court acknowledged that a number of "labels" suggested by the federal appeals courts, in an attempt to more precisely define antitrust standing, "may lead to contradictory and inconsistent results … In our view, courts should analyze each situation in light of the factors set forth in the text [of *Associated General*]." *Id.* at 908 n.33. The Supreme Court declined to articulate a bright-line rule as to antitrust standing and injury. *Id.* at 907–08. Instead it encouraged courts to employ a broad balancing analysis that "requires us to evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." *Id.*

Standing analysis involves consideration of the nexus between the antitrust violation and the plaintiff's harm and whether the harm alleged is of the type for which Congress provides a remedy. *Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. 104, 107 S. Ct. 484, 489, 93 L. Ed. 2d 427 (1986). Although a showing of antitrust injury is necessary, it is "not always sufficient … to establish standing under [section] 4, because a party may have suffered antitrust injury but may not be a proper plaintiff under [section] 4 for other reasons." *Id.* at 489 n. 5.

This circuit employs a two-prong test for antitrust standing under Section Four of the Clayton Act. *Palmyra Park Hosp., Inc.*[ *v. Phoebe Putney Mem'l Hosp.*], 604 F.3d [1291,] 1299[ (11th Cir. 2010)]. First, the

plaintiff must establish that it has suffered an antitrust injury. *Id.*, citing *Todorov,* 921 F.2d at 1449.[12] Second, the plaintiff must be an "efficient enforcer" of the antitrust laws. *Id.; Fla. Seed Co.*, 105 F.3d at 1374; *Mun. Utils. Bd. of Albertville v. Ala. Power Co.*, 934 F.2d 1493, 1499 (11th Cir. 1991).

*Sunbeam Television Corp. v. Nielsen Media Research, Inc.*, 711 F.3d 1264, 1270–71 (11th Cir. 2013) (footnote omitted). JDI disputes only whether the Plaintiffs satisfy the second prong of antitrust standing, arguing that the complaint fails to plausibly allege that the Plaintiffs are "efficient enforcers" to bring their antitrust claims.

### 1.   Willing and Able Competitor

In antitrust cases alleging an illegal monopoly, the Eleventh Circuit appears to impose a firm requirement for "efficient enforcers," holding: "Whether or not the plaintiff is a customer or a competitor, in order to meet the second prong, the

---

12 **"**The antitrust laws were enacted for the protection of *competition*, not *competitors*." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338, 110 S. Ct. 1884, 1891, 109 L. Ed. 2d 333 (1990) (quotation omitted). "Thus, antitrust injuries include only those injuries that result from interference with the freedom to compete." *Johnson v. Univ. Health Servs., Inc.*, 161 F.3d 1334, 1338 (11th Cir. 1998). Antitrust plaintiffs "must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove antitrust injury, which is to say injury of the type that the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be the type of loss that the claimed violations would be likely to cause." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S. Ct. 690, 697, 50 L. Ed. 2d 701 (1977) (quotation omitted). *See also Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1069 (11th Cir. 2004) (under §§ 1 and 2 of the Sherman Act, "an antitrust plaintiff must show harm to competition in general, rather than merely damage to an individual competitor"). "This requirement ensures that the plaintiff, although motivated by private interests, is seeking to vindicate the type of injury to the public that the antitrust laws were designed to prevent." *Sunbeam Television Corp.*, 711 F.3d at 1271 n.16 (citing *Austin v. Blue Cross & Blue Shield of Ala.*, 903 F.2d 1385, 1389–90 (11th Cir. 1990)).

plaintiff must prove the existence of a competitor willing and able to enter the relevant market, but for the exclusionary conduct of the incumbent monopolist." *Id.* at 1273. *See also Gas Utilities Co. of Ala. v. S. Nat. Gas Co.*, 996 F.2d 282, 283 (11th Cir. 1993) (per curiam) ("The law clearly requires a showing of an intention and preparedness to enter the business to give a plaintiff a cause of action for being foreclosed from the market." (citing *Cable Holdings of Ga., Inc. v. Home Video, Inc.*, 825 F.2d 1559, 1562 (11th Cir. 1987)). Thus, in order to sufficiently plead an antitrust monopoly claim, the plaintiff must plead facts plausibly showing that a competitor has "take[n] some affirmative step to enter the business." *Gas Utilities*, 996 F.2d at 283. "The mere possibility of financing being available in the abstract is not enough. Showing that someone somehow could possibly obtain financing is not the same as showing that plaintiffs themselves were able and prepared to. Likewise, showing that someone may be interested in entering into a contract if the price is right is not the same as having an enforceable contract." *Id.* (citation and quotation omitted). Likewise, "[i]nquiry into procedures" – "activities [that are] merely preliminary steps taken in anticipation of preparing to enter the market such as communication with the licensing authority, investigation of costs and feasibility, and inquiry regarding" applicable laws and regulations – "is insufficient to establish preparedness." *Id.*

JDI argues that the Plaintiffs' monopolization claims in Counts I, III, and IV are due to be dismissed because they have failed to allege the existence of a competitor willing and able to enter the respective markets relevant to those claims

– specifically, the MAA and DTPA markets for Count I, the MDP and Sodium Iodine I-131 markets for Counts III and IV, and the Sestamibi market for Count IV. In their initial response brief, the Plaintiffs do not dispute that they are required to allege the existence of a "willing and able competitor" to succeed on their monopolization claims, but argue that they have sufficiently identified potential competitors for the MAA, MDP, and Sodium Iodine I-131 markets.[13] By failing to

---

[13]     In their sur-reply, the Plaintiffs argue that "requiring a customer-plaintiff **to plead** excluded competitors, would fly in the face of the Supreme Court's holding that '[n]either proof of exertion of the power to exclude **nor proof of actual exclusion** of existing or potential competitors is essential to sustain a charge of monopolization under the Sherman Act.' " (Doc. 54, PageID.372 (emphasis in original) (quoting *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S. Ct. 1125, 90 L. Ed. 1575 (1946)). This argument is meritless. First, *American Tobacco* concerned criminal antitrust charges brought by the government, rather than civil claims by a private actor; therefore, neither "efficient enforcer" analysis, nor any other aspect of "antitrust standing," was at issue in that case. At most, the foregoing provision means that proof of a "willing and able competitor" is not an element of an antitrust claim, which does not foreclose it from being a requirement of antitrust standing. *See Sunbeam Television*, 711 F.3d at 1270–71 ("In order to recover treble damages, Section Four requires that a private plaintiff enforcing the antitrust laws must establish both: (1) that the plaintiff has standing; *and*, (2) that the defendant has violated the antitrust laws." (emphasis added)); *Cable Holdings*, 825 F.2d at 1562 ("Proof of a violation of the Sherman Act standing alone does not establish *civil* liability." (emphasis added)).

        Second, long after *American Tobacco* was decided, the Eleventh Circuit has nevertheless repeatedly held that a plaintiff alleging an illegal monopoly must show a "willing and able competitor" to be considered an "efficient enforcer" with antitrust standing. Under the Eleventh Circuit's prior panel precedent rule, binding panel precedent cannot be disregarded until it is overruled or abrogated by the Supreme Court or the Eleventh Circuit sitting *en banc*, even if a court is convinced the "prior case was wrongly decided, … *failed to consider certain critical issues or arguments*, … or … lacked adequate legal analysis to support its conclusions…" *United States v. Lee*, 886 F.3d 1161, 1163 & n.3 (11th Cir. 2018) (per curiam) (emphasis added), *cert. denied*, 140 S. Ct. 275 (2019). Thus, even if Eleventh Circuit precedent requiring a "willing and able competitor" is arguably inconsistent with *American Tobacco*, this Court is not free to disregard that precedent. Moreover, *Twombly* and *Iqbal* now make clear that a civil complaint must contain sufficient factual allegations

argue likewise with regard to the DTPA and Sestamibi markets, the Plaintiffs effectively concede that they have failed to show antitrust standing to bring monopoly claims based on those markets. Certainly, no potential competitor for these markets is readily apparent on the face of the complaint.[14]

With regard to MAA, one of JDI's sole source products, the Plaintiffs point to their allegations that Lantheus Medical Imaging, Inc. ("Lantheus"), another "major manufacturer[] of radiopharmaceutical products[,]" had "serious interest" in acquiring the Pulmolite NDA and, prior to JDI acquiring the Pulmolite NDA from Pharmalucence in 2013, a "vice president of Lantheus … had unsuccessful discussions with Pharmalucence" about purchasing the NDA with the intent to market Pulmolite as a competing product to MAA. (*See* Doc. 1, PageID.14, 29, ¶¶ 47, 107-109). However, a valid competitor must be shown to be "willing and able to enter the relevant market[] but for the exclusionary conduct *of the incumbent monopolist.*" *Sunbeam Television Corp.*, 711 F.3d at 1273 (emphasis added). As JDI correctly points out in reply, the Plaintiffs' allegations indicate that Pharmalucence, rather than JDI, was responsible for excluding Lantheus from the MAA market by refusing to sell it the Pulmolite NDA, and the complaint contains no allegations indicating that JDI was in any way responsible for inducing this refusal. Likewise,

---

plausibly showing that a plaintiff is entitled to relief – which requires the plaintiff to show, among other things, that it is an "efficient enforcer," which in turn requires it to identify a "willing and able competitor" in monopoly antitrust cases.

[14] Moreover, as will be explained later, the Plaintiffs have failed to plausibly allege relevant product markets for DTPA and Sestamibi, and thus any federal antitrust claims related to those proposed markets are due to be dismissed on that basis as well.

while the Plaintiffs allege that JDI refused to license products under the Pulmolite NDA after buying it (*see* Doc. 1, PageID.29, ¶ 110), they do not identify a potential competitor that actually approached JDI for a license and was denied.[15]

Additionally, the undersigned agrees with JDI that the mere fact Lantheus had "serious interest" in the Pulmolite NDA, and discussed the possibility of purchasing it from Pharmalucence, is insufficient to plausibly show that Lantheus was prepared to enter the MAA market. The Plaintiffs argue that "[o]ne can reasonably infer … that JDI had an economic incentive (and, anticipating its enhanced future income stream, the means) to pay a premium [for the Pulmolite NDA] that no other rational market player would pay." (Doc. 50, PageID.305 n.5]. Even assuming that this is a reasonable inference, it merely indicates that Lantheus's offer to buy the NDA fell short of the price Pharmalucence desired. This suggests that Lantheus was really interested in buying the NDA only "if the price [wa]s right[,]" which is insufficient to show preparedness. *Gas Utilities*, 996 F.2d at 283.[16]

---

[15] The Plaintiffs' citation to *United States v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001) (en banc) (per curiam), and *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S. Ct. 1404, 8 L. Ed. 2d 777 (1962), in opposition to this point is inapposite. The portion of *Microsoft Corp.* on which the Plaintiffs rely concerned demonstrating causation to establish an antitrust violation, while the portion of *Continental Ore* on which the Plaintiffs rely concerned proving an antitrust conspiracy, which the Plaintiffs have not alleged in their complaint. Neither concerned "efficient enforcer" or "antitrust standing" analysis.

[16] The complaint alleges that a UPPI director and two UPPI members also unsuccessfully attempted to buy the Pulmolite NDA from Pharmalucence. (*See* Doc. 1, PageID.29, ¶¶ 107-108). The Plaintiffs do not rely on those allegations in response to JDI's present motion. Regardless, similar to Lantheus, the complaint's allegations

As for the MDP and Sodium I-131 markets, the Plaintiffs claim that they have "alleged the existence of competitors who are prepared to (and in fact do) compete with JDI" in these market, and that they "have alleged that but for the anticompetitive tying arrangement, those competitors would be in a position to compete with JDI for sales of the tied products." (Doc. 50, PageID.306-307 (citing Doc. 3, PageID.94-95, ¶¶ 119-122)). In reply JDI correctly points out that the Plaintiffs have failed to actually identify any competitor who was excluded by JDI from entering the MDP and Sodium I-131 markets; indeed, they concede that its purported competitors "in fact do" compete with JDI in these markets. Moreover, the allegations in paragraphs 119 through 122 concern the harm of JDI customers having to pay inflated prices for products as a result of its allegedly unlawful tying arrangement, rather than exclusion of potential competitors from a particular market.

For the foregoing reasons, the Plaintiffs have failed to plausibly allege the existence of a competitor willing and able, but for JDI's exclusionary conduct, to enter any of the markets relevant to their monopolization claims. Because, under Eleventh Circuit precedent, this is fatal to the Plaintiffs' ability to show that they are "efficient enforcers" to bring their monopolization antitrust claims, the Plaintiffs cannot demonstrate that they have antitrust standing to bring those claims. For this reason, Counts I, III, and IV are due to be dismissed under Rule 12(b)(6).

---

indicate that Pharmalucense, rather than JDI, was responsible for thwarting UPPI and its two members' entrance into the MAA market by Pharmalucense, and they fail to plausibly show that UPPI or its two members were prepared to enter the market.

### 2.    Other "Efficient Enforcer" Factors

JDI also argues, apart from the Plaintiffs' failure to show a "willing and able competitor," that consideration of other relevant factors does not support finding the Plaintiffs to be "efficient enforcers" of any of their antitrust claims. Generally, "[t]he factors to be considered in determining whether a plaintiff is an efficient enforcer are: (1) the directness or indirectness of the asserted injury; (2) the remoteness of the injury; (3) whether other potential plaintiffs were better suited to vindicate the harm; (4) whether the damages were highly speculative; (5) the extent which the apportionment of damages was highly complex and would risk duplicative recoveries; and (6) whether the plaintiff would be able to efficiently and effectively enforce the judgment." *Sunbeam Television*, 711 F.3d at 1271. "[O]ther factors might also be relevant as these factors are often intertwined, with no single predominate factor." *Id.* at 1271-72 (citing *Todorov*, 921 F.2d at 1451–52).

JDI focuses only on two of these factors, claiming that the Plaintiffs' damages are "highly speculative," and their apportionment would be "highly complex," and their arguments in support of these factors are largely premised on the Plaintiffs' claims failing in some way before damages would even be at issue. (*See* Doc. 36, PageID.244 ("First, as discussed in further detail above, any damages with respect to Plaintiffs' monopolization and contractual restraint claims are entirely speculative. Specifically, as no competitor willing and able to enter any of the allegedly monopolized markets has been alleged, Plaintiffs' damages from any alleged monopolization or attempted monopolization are entirely theoretical. As a

further example, because Plaintiffs do not allege that IonSouth or any other particular member of UPPI was engaged in re-selling or fractionating JDI's products prior to entering into the JDI Master Agreement, Plaintiffs' damages from these alleged restraints are also completely speculative."); *id.*, PageID.244-245 ("Second, the damages envisioned by Plaintiffs' allegations would require difficult calculations and complex apportionment. With no other suppliers of MAA or DTPA in the U.S. market since at least 2011, see PageID.90 (¶ 104), and no company alleged to be willing and able to enter either proposed product market, the calculation of any overcharges due to the alleged monopolization of these markets would be exceedingly difficult, if not impossible, and any attempt to estimate damages would be pure guesswork."). As to the few arguments not so premised, (*see id.* ("As to the competitive damages allegedly caused by JDI's audits, those, too, are based solely upon Plaintiffs' speculation that JDI shared that information with Triad, which then used that information to obtain an improper competitive advantage, causing some unexplained harm to IonSouth and other nuclear pharmacies … Also, while Plaintiffs allege that JDI's prices were higher than those of other pharmaceutical companies selling alternative products for MDP, Sestamibi, and I-131, Plaintiffs' allegations appear to be premised upon list prices, despite their acknowledgement that discounts off of list prices were available, and in fact extended to JDI's customers … Assuming that Plaintiffs' allegations are true, and discounts were not uniform, it would be extremely difficult for this Court to calculate and apportion damages amongst the putative class members.")), they are rather conclusory

argued, and fail to convince the undersigned that these two factors, without considering any others, weigh so conclusively against finding the Plaintiffs to be "efficient enforcers" that dismissal of the Plaintiffs' antitrust claims under Rule 12(b)(6) is warranted on that basis.

### c. Relevant Product Markets

Section 1 of the Sherman Act makes unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Although the section's language seems automatically to prohibit any kind of concerted restraint of trade, the Supreme Court's interpretation of the Act indicates that many forms of concerted action are to be evaluated under a flexible, case-by-case standard: the so-called "rule of reason." *See Standard Oil Co. v. United States,* 221 U.S. 1, 58–62, 31 S. Ct. 502, 515–16, 55 L. Ed. 619 (1911) (adopting the rule of reason). Under the rule of reason, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Cont'l T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 49, 97 S. Ct. 2549, 2557, 53 L. Ed. 2d 568 (1977).

…

Under rule of reason analysis, a plaintiff may show either actual or potential harm to competition. *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1551 (11th Cir. 1996) … Regardless of whether the plaintiff alleges actual or potential harm to competition, however, he must identify the relevant market in which the harm occurs…

…

Section One plaintiffs must define both (1) a geographic market and (2) a product market. *See Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 464 (3d Cir. 1998) ("In the usual rule of reason case, to establish a violation of § 1, plaintiffs must prove ... that the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets.") Although the "parameters

of a given market are questions of fact," *Thompson v. Metro. Multi–List, Inc.*, 934 F.2d 1566, 1573 (11th Cir. 1991),[17] antitrust plaintiffs still must present enough information in their complaint to plausibly suggest the contours of the relevant geographic and product markets.[18] Since both the geographic and product market allegations are necessary for a plaintiff suing under § 1 of the Sherman Act to succeed, a court, in assessing the sufficiency of the complaint, may begin by analyzing either one. *See Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 n.4 (9th Cir. 2008) (analyzing the product market where the defendant did not challenge the plaintiff's assertion of the United States as a geographic market).

*Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1333–34, 1336 (11th Cir. 2010).

*See also L.A. Draper & Son v. Wheelabrator–Frye, Inc.,* 735 F.2d 414, 422 (11th Cir.

---

[17] *See also Duty Free Americas*, 797 F.3d at 1264 ("Defining the relevant product market is a fact-intensive endeavor.").

[18] Thus, the undersigned cannot accept the Plaintiffs' categorical assertion that the "product market inquiry is … not appropriately decided at the pleadings stage" (Doc. 50, PageID.316), "because it would absolve [them] of the responsibility under *Twombly* to plead facts 'plausibly suggesting' the relevant submarket's composition." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1338 (11th Cir. 2010). *Accord Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 71 n.5 (11th Cir. 2014) ("The plaintiffs insist that market details are not available pre-discovery and should not be required at the pleading phase. Our antitrust precedent specifically rejects that argument. The *Jacobs* plaintiffs argued that their complaint had been erroneously dismissed, claiming that they were entitled to 'add facts in discovery' about market share and product substitutability. 626 F.3d at 1338. In response, we explained that accepting the plaintiffs' argument 'would absolve [plaintiffs] of the responsibility under *Twombly* to plead facts "plausibly suggesting" the relevant submarket's composition.' *Id.* Here, the plaintiffs cannot similarly invoke discovery to avoid pleading some specific market details."). *See also Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) ("It is true that in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers … Plaintiffs err, however, when they try to turn this general rule into a *per se* prohibition against dismissal of antitrust claims for failure to plead a relevant market under Fed. R. Civ. P. 12(b)(6)."); *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market … There is, however, no absolute rule against the dismissal of antitrust claims for failure to allege a relevant product market.").

1984) (an "antitrust plaintiff … makes out a prima facie case under the rule of reason only upon proof of a well-defined relevant market upon which the challenged anticompetitive actions would have substantial impact" (quotation omitted)).[19]

"Defining the market is [also] a necessary step in any analysis of market power and thus an indispensable element in the consideration of any monopolization or attempt case arising under section 2" of the Sherman Act. *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 994 (11th Cir. 1993).

> Like claims under Section One, Section Two claims require harm to competition that must occur within a "relevant", that is, a distinct market, with a specific set of geographical boundaries and a narrow delineation of the products at issue … Under Section One, this

---

[19]     "Section One claims that do not allege per se antitrust violations are analyzed under th[e] 'rule of reason,' and the claims fail if the restraint on trade is reasonable." *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1071 (11th Cir. 2004). "[P]er se violations of § 1 of the Sherman Act are limited to a very small class of antitrust practices whose character is well understood and that almost always harm competition. Examples of such per se illegality include horizontal price fixing among competitors, group boycotts, and horizontal market division—business relationships that, in the courts' experience, virtually always stifle competition." *Jacobs*, 626 F.3d at 1334 (citations omitted). *See also Texaco Inc. v. Dagher*, 547 U.S. 1, 5, 126 S. Ct. 1276, 164 L. Ed. 2d 1 (2006) ("[T]his Court presumptively applies rule of reason analysis, under which antitrust plaintiffs must demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful. Per se liability is reserved for only those agreements that are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality. Accordingly, we have expressed reluctance to adopt *per se* rules where the economic impact of certain practices is not immediately obvious." (citations and quotations omitted)).

A tying arrangement can also be a *per se* antitrust violation "if the seller has sufficient economic power with respect to the tying product to restrain free competition in the market for the tied product and if a not insubstantial amount of interstate commerce is affected." *Midwestern Waffles*, 734 F.2d at 711–12. While the Plaintiffs' complaint alleges that JDI's tying arrangement is a *per se* violation of § 1 (*see* Doc. 1, PageID.41, 46, ¶¶ 151, 177), they have not argued as such in opposition to JDI's present motion, nor do they dispute that "rule of reason" analysis applies to their § 1 claims.

> "relevant market" must have been harmed by an unreasonable restraint on trade, *L.A. Draper & Son v. Wheelabrator–Frye, Inc.,* 735 F.2d 414, 421 (11th Cir. 1984), while under Section Two, the alleged monopolist must possess enough power or potential power in this "relevant market" in order to harm competition. *Morris Communications Corp. v. PGA Tour, Inc.,* 364 F.3d 1288, 1293–94 (11th Cir. 2004).[20]

*Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1074 (11th Cir. 2004) (footnote omitted). JDI argues that the Plaintiffs have failed to plausibly allege the contours of a relevant product market to support any of their antitrust claims.[21]

" 'Defining a relevant product market is primarily a process of describing those groups of producers which, because of the similarity of their products, have the ability—actual or potential—to take significant amounts of business away from each other.' " *Duty Free Americas*, 797 F.3d at 1263 (quoting *Polypore Int'l, Inc. v. FTC*, 686 F.3d 1208, 1217 (11th Cir. 2012) (quoting *U.S. Anchor Mfg.*, 7 F.3d at 995)). Put another way,

> [d]efining the relevant product market involves identifying "producers that provide customers of a defendant firm (or firms) with alternative sources for the defendant's product or services." *Levine,* 72 F.3d at 1552. "The 'market is composed of products that have reasonable

---

[20] *See also U.S. Anchor Mfg.*, 7 F.3d 995–96 ("[T]he very purpose of defining the relevant market under section 2 is to determine whether a monopolist, cartel or oligopoly in that market would be able to reduce marketwide output simply by cutting its own output, and thereby raise marketwide prices above competitive levels.")

[21] The complaint alleges that "the relevant geographic market is the United States" for each relevant product. (Doc. 1, PageID.26, ¶ 95). JDI's present motion raises no challenge as whether the complaint plausibly alleges a relevant geographic market; accordingly, the undersigned does not address that issue.

interchangeability.' " *Id.* (quoting *United States v. E.I. du Pont de Nemours & Co.* (*Cellophane*), 351 U.S. 377, 404, 76 S. Ct. 994, 1012, 100 L. Ed. 1264 (1956)).[22] Most importantly, [a court] should look " 'to the uses to which the product is put by consumers in general.' " *Maris Distrib. Co. v. Anheuser–Busch, Inc.,* 302 F.3d 1207, 1221 (11th Cir. 2002) (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 438 (3d Cir. 1997)).

A relevant product market can exist as a distinct subset of a larger product market. *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.,* 7 F.3d 986, 995 (11th Cir. 1993). The Supreme Court has provided "practical indicia" that can determine the contours of the submarket,[23] such as "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S. Ct. 1502, 1524, 8 L. Ed. 2d 510 (1962). A court should pay particular attention to evidence of the cross-elasticity of demand and reasonable substitutability of the products, because "[i]f consumers view the products as substitutes, the products are part of the same market." *Rebel Oil Co. v. Atl. Richfield Co.,* 51 F.3d 1421, 1435 (9th Cir. 1995).

*Jacobs*, 626 F.3d at 1337–38 (footnotes omitted). "The fact that a company limits its competitive activity to a single firm's products (and at only one competitive level)

---

22 *See also Duty Free Americas*, 797 F.3d at 1264 (A " 'product market consists of "products that have reasonable interchangeability for the purposes for which they are produced." ' " (quoting *McWane, Inc. v. FTC*, 783 F.3d 814, 828 (11th Cir. 2015) (quoting *Cellophane*, 351 U.S. at 404))).

23 "The term 'submarket' is somewhat of a misnomer, since the 'submarket' analysis simply clarifies whether two products are in fact 'reasonable' substitutes and are therefore part of the same market. The emphasis always is on the actual dynamics of the market rather than rote application of any formula." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004).

cannot control the definition of the relevant market." *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 282 (5th Cir. 1978).[24]

"The cross-elasticity of demand measures the change in the quantity demanded by consumers of one product relative to the change in price of another." *Jacobs*, 626 F.3d at 1337 n.13.[25] "A high cross-elasticity of demand (that is, consumers demanding proportionately greater quantities of Product X in response to a relatively minor price increase in Product Y) indicates that the two products are close substitutes for each other—that is, consumers derive comparable utility from equivalent consumption of either one. For purposes of the relevant product market analysis, a high cross-elasticity of demand indicates that the two products in question are reasonably interchangeable substitutes for each other and hence are part of the same market." *Jacobs*, 626 F.3d at 1337 n.13. "The reasonable

---

[24] On "October 1, 1981 pursuant to the Fifth Circuit Court of Appeals Reorganization Act of 1980, P.L. 96-452, 94 Stat. 1995, … the United States Court of Appeals for the Fifth Circuit was divided into two circuits, the Eleventh and the 'new Fifth.' " *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc). "The Eleventh Circuit, in the *en banc* decision *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981." *Smith v. Shook*, 237 F.3d 1322, 1325 n.1 (11th Cir. 2001) (per curiam).

[25] *See also Duty Free Americas*, 797 F.3d at 1263 (cross-elasticity of demand is "the extent to which consumers demand less of the particular product as the price for its alleged substitute declines"); *McWane, Inc.*, 783 F.3d at 828 (" 'Cross-elasticity of demand' measures the extent to which modest variations in the price of one good affect customer demand for another good."); *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 227 (2d Cir. 1999) (per curiam) ("In economists' terms, two products or services are reasonably interchangeable where there is sufficient cross-elasticity of demand. Cross-elasticity of demand exists if consumers would respond to a slight increase in the price of one product by switching to another product.").

interchangeability of use or the cross-elasticity of demand between a product and its substitutes constitutes the outer boundaries of a product market for antitrust purposes." *U.S. Anchor Mfg.*, 7 F.3d at 995 (footnote omitted). "Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way." *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) (Sotomayor, J.) (footnotes omitted).

In *Jacobs*, the plaintiffs' antitrust complaint alleged, "without elaboration, that '[v]isco-elastic foam mattresses comprise a relevant product market, or sub-market, separate and distinct from the market for mattresses generally, under the federal antitrust laws.' " 626 F.3d at 1338. The Eleventh Circuit affirmed the dismissal of that complaint for failure to plausibly allege a relevant product market or submarket, holding that the "complaint provide[d] no factual allegations of the cross-elasticity of demand or other indications of price sensitivity that would indicate whether consumers treat visco-elastic foam mattresses differently than they do mattresses in general." *Id.* Though the plaintiffs alleged "that visco-elastic foam mattresses are more expensive than traditional innerspring mattresses and that visco-elastic foam mattresses have 'unique attributes[,]' " the court found those allegations "of little help[ because] they do not indicate the degree to which consumers prefer visco-elastic foam mattresses to traditional mattresses because of

these unique attributes and differences in price." *Id.* (alteration added). For example, the complaint failed to allege facts showing whether "a consumer whose innerspring mattress was due for replacement [would] be more likely to purchase another innerspring mattress or substitute a visco-elastic foam model for it[, or whether] visco-elastic foam mattresses [are] put to different uses (as luxury goods, such as in fine hotels and within higher income brackets) than are traditional mattresses…" *Id.* Further noting that " 'the broader economic significance of a submarket must be supported by demonstrable empirical evidence[,]' " *id.* (alteration added) (quoting *U.S. Anchor*, 7 F.3d at 998)), the court held that the plaintiffs had failed "the obligation under *Twombly* to indicate that [they] could provide evidence plausibly suggesting the definition of the alleged submarket." *Id.*

In *Clark Memorials of Alabama Inc. v. SCI Alabama Funeral Services. LLC*, 991 F. Supp. 2d 1151 (N.D. Ala. 2014),[26] cited by JDI, the plaintiff attempted to define "the burial lot market" as the relevant market for its tying antitrust claim. 991 F. Supp. 2d at 1160. While the district court ultimately found that the plaintiff

---

[26] "A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." *Camreta v. Greene*, 563 U.S. 692, 709, 131 S. Ct. 2020, 2033 n.7 (2011) (quotation omitted)). *Accord Washington v. Rivera*, 939 F.3d 1239, 1244 n.8 (11th Cir. 2019) ("[D]istrict court opinions are not binding precedent."); *United States v. Cerceda*, 172 F.3d 806, 812 n.6 (11th Cir. 1999) (en banc) (per curiam) ("The opinion of a district court carries no precedential weight, even within the same district."); *Fox v. Acadia State Bank*, 937 F.2d 1566, 1570 (11th Cir. 1991) (per curiam) ("A district court is not bound by another district court's decision, or even an opinion by another judge of the same district…"). *See also McGinley v. Houston*, 361 F.3d 1328, 1331 (11th Cir. 2004) (per curiam) ("The general rule is that a district judge's decision neither binds another district judge nor binds him, although a judge ought to give great weight to his own prior decisions.").

had failed to plausibly allege that market's geographic component, in a footnote the court also "question[ed] whether [the plaintiff] sufficiently defined the tying product market[,]" noting: "Cremations, for example, are functionally interchangeable products with burials in that both are accepted ways to handle a body after a person has died. A well-pleaded product market is typically defined based on consumer behavior. [The plaintiff] has not pleaded any facts to suggest that consumers view burial lots as a product market separate and distinct from other competing product. Without additional facts to suggest why [the plaintiff] has defined the product market this way, the Court cannot determine that the product market it has pleaded is in fact plausible." *Id.* at 1161 n.6.

The present complaint alleges that "[t]here are five relevant product markets in this case: (1) the market for cold kits designed for the preparation of Tc99m MAA injections; (2) the market for cold kits designed for the preparation of Tc99m DTPA injections; (3) the market for cold kits designed for the preparation of Tc99m MDP; (4) the market for cold kits designed for the preparation of Tc99m Sestamibi injections; and (5) the market for Sodium Iodine I-131..." (Doc. 1, PageID.21, ¶ 67). It appears, then, as alleged in the complaint, and as argued in the parties' briefs, that the Plaintiffs are claiming 5 distinct, single-product relevant markets.[27] The Plaintiffs argue that they have sufficiently alleged the contours of all five.

_____

[27] *Cf. Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1297 (11th Cir. 2010) ("The complaint identifies three separate medical-services product markets in which Phoebe Putney possesses market power due to its [state-issued Certificates of Need]: acute-care obstetrics, neonatology, and cardiovascular catheterization services provided to privately insured patients. These three markets

### 1.     MAA

The complaint alleges that MAA, "[o]nce tagged with Tc99m, … functions as a lung-imaging agent used as an adjunct during the perfusion stage of a V/Q scan." (*Id.*, PageID.22, ¶ 71). Per the complaint, a "V/Q scan is a nuclear medicine procedure that uses radioactive material to assess the flow of air and blood in the lungs. Physicians use it to detect pulmonary embolism or other lung irregularities … A V/Q scan consists of two different tests, a perfusion scan and a ventilation scan. The scans are typically performed together but can be done separately. If the patient's lungs are properly functioning, the two scans will match. If the images differ, the patient may have a blood clot … During the perfusion phase, a health care provider injects MAA intravenously. The lungs are then scanned by a special camera that detects the distribution of blood flow in the lungs. If the patient does have a blood clot, the images from this scan will reveal areas of the lungs that are not receiving enough blood." (*Id.*, PageID.22-23, ¶¶ 72-74). The complaint further alleges that "MAA is the only radiopharmaceutical currently available in the U.S. for imaging perfusion in the lungs" (*id.*, PageID.22, ¶ 71), and that "[f]or many patients, there is no substitute for a V/Q scan[,]" explaining: "While a computed tomography scan ('CT scan') may be suitable for diagnosing pulmonary embolism in

---

constitute the tying-products markets. Palmyra identifies eight separate markets for medical services in which it competes with Phoebe Putney: acute-care cardiology, gastroenterology, general surgery, gynecology, medicine, oncology, pulmonary care, and urology services provided to privately insured patients. These eight markets constitute the tied-products markets. According to Palmyra, there is no cross-price elasticity of demand for any of the separate markets because none of the services are substitutes for each other; a patient seeking neonatology care, for example, will not turn instead to oncology care if the price is low enough." (footnote omitted)).

a select patient population, the effective radiation dose to the patient is considerably higher, making it inappropriate—or even dangerous—for many individuals. For instance, CT scans pose a greater risk to females, as the effective radiation dose to the breast is 20–40 times greater with a CT scan than V/Q. The higher radiation exposure of CT scans can lead to an increased risk of developing breast cancer." (*Id.*, PageID.23, ¶ 75).

These allegations, accepted as true, plausibly plead a product market/submarket consisting of only MAA cold kits. The Plaintiffs allege that MAA cold kits are the "only radiopharmaceutical currently available in the U.S." to perform the perfusion portion of a V/Q scan. JDI points to the Plaintiffs' acknowledgement that CT scans can substitute for V/Q scans in detecting pulmonary embolism. However, as the Plaintiffs respond, "functionally similar products may be in separate product markets, depending on the facts of the case." *FTC v. Lundbeck, Inc.*, 650 F.3d 1236, 1241 (8th Cir. 2011) (citing cases).

For instance, in *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056 (3d Cir. 1978), the district court defined the relevant product market as limited to cephalosporin anti-biotics only, rather than including other antibiotics as urged by the appellant. *See* 575 F.2d at 1064.

> Regarding the interchangeability of cephalosporins and other anti-infective drugs, the district court found that, although there is a certain degree of interchangeability among all antibiotics, there are significant differences between groups in the areas of effectiveness and toxicity. Cephalosporins are considered more desirable by some physicians because they are broad spectrum anti-infectives, that is they are effective against a wider range of infectious organisms than are

other antibiotics. In addition, cephalosporins are generally used in treating penicillin-allergic patients. Particularly significant in terms of practical interchangeability is the fact that cephalosporins are effective against certain organisms where other anti-infectives are not, and vice versa.

The district court noted, for example, that cephalosporins are less toxic, i. e., produce fewer undesirable side effects, than some other anti-infectives. In addition, unlike penicillins, cephalosporins are effective against the organism Klebsiella; they are also active against both staphylococci and gram negative bacilli, whereas penicillins tend to be active against one but not the other. These features can obviously be of great significance in the determination of the proper medication for a given patient. Thus, although there is a certain overlap in therapeutic capability, in the view of the district court, cephalosporins possess sufficiently unique features to warrant their characterization as a discrete product market, one lacking interchangeability with antibiotics in general.

*Id.* at 1064. The Third Circuit held that "[t]he analysis of the district court comports with the standard for defining relevant market enunciated by the Supreme Court[,]" and thus affirmed the district court's product market definition. *Id.* at 1064-65.

Similarly, here the Plaintiffs alleges that V/Q scans can "detect other lung irregularities" in addition to pulmonary embolism, while not alleging the same for CT scans, indicating that V/Q scans are more useful in detecting lung irregularities. *Cf. id.* at 1064 (noting that "[c]ephalosporins are considered more desirable by some physicians because they are broad spectrum anti-infectives, that is they are effective against a wider range of infectious organisms than are other antibiotics"). Moreover, similar to the "less toxic" cephalosporins in *SmithKline Corp.*, the Plaintiffs have alleged facts showing that V/Q scans expose patients to less potentially harmful radiation than CT scans. "Thus, although there is a certain overlap in therapeutic

capability," the complaint plausibly indicates that MAA-dependent V/Q scans "possess sufficiently unique features to warrant their characterization as a discrete product market, one lacking interchangeability with" CT scans. *SmithKline Corp.*, 575 F.2d at 1064. Accordingly, the undersigned finds that the Plaintiffs have sufficiently pleaded a market/submarket consisting of MAA cold kits, and JDI's motion to dismiss is due to be denied to the extent it claims otherwise.

## 2.    DTPA

Per the complaint, "DTPA is a widely used nuclear medicine imaging agent with a variety of indications, including renal and brain imaging. It is the only renal radiopharmaceutical available that can be used to measure glomerular filtration rate, the best test to measure a patient's level of kidney function." (Doc. 1, PageID.23, ¶ 79). Following approval by the Food and Drug Administration in 2018, "JDI's DTPA cold kit is now indicated to be used in aerosol form in conjunction with MAA to perform a V/Q scan[,]" with DTPA "used during the ventilation part of the test." (*Id.*, PageID.24, ¶ 80). "During the ventilation scan, the patient breathes in a radioactive gas, such as DTPA, through a mask or tube and is scanned again. The scanner picks up the distribution pattern of the inhaled radioisotope in the lungs." (*Id.*, ¶ 81).

The undersigned agrees with JDI that the Plaintiffs have failed to allege sufficient facts supporting a relevant product market consisting of only DTPA cold kits. Unlike with MAA cold kits, the Plaintiffs do not allege that DTPA cold kits are the only product that can be used to perform the ventilation portion of a V/Q scan –

indeed, the Plaintiffs acknowledgement that DTPA was only approved for use in V/Q scans in 2018 suggests the opposite, and the Plaintiffs fail to show that DTPA possesses any "sufficiently unique features" when used in V/Q scans. *SmithKline Corp.*, 575 F.2d at 1064. The Plaintiffs also fail to allege that DTPA cold kits are in some way unique in performing "brain imaging." While the Plaintiffs do allege that DTPA is "the only renal radiopharmaceutical available that can be used to measure glomerular filtration rate, the best test to measure a patient's level of kidney function." However, as JDI points out, this statement is indicative of "a certain overlap" among the DTPA-dependent test and other tests for kidney function, and the Plaintiffs fail to substantiate it with any reasonably specific factual allegations plausibly demonstrating greater desirability or "sufficiently unique features" of the DTPA-dependent test "to warrant [DTPA's] characterization as a discrete product market…" *Id.*[28] The Plaintiffs' brief in opposition to the present motion fails to point to any other "factual allegations of the cross-elasticity of demand or other indications of price sensitivity that would indicate whether consumers treat" DTPA differently from other products serving similar purposes. *Jacobs*, 626 F.3d at 1338.[29]

---

[28] By comparison, as explained above, the Plaintiffs did allege facts plausibly demonstrating the greater desirability and "sufficiently unique features" of the MAA-dependent V/Q test to distinguish it as a separate market from the substitute, non-MAA-dependent CT scan.

[29] The Plaintiffs' allege that "JDI's DTPA is a product with unique indications; it lacks readily available substitutes." (Doc. 1, PageID.24, ¶ 82). They included a similar allegation for MAA (*see id.*, PageID.23, ¶ 76), and further allege that each of their alleged relevant market products "is distinguishable in the eyes of radiopharmaceutical manufacturers, radiopharmacies, and end-user healthcare professionals" and "is not reasonably interchangeable with other products." (*Id.*,

For this reason, the Plaintiffs' federal antitrust claims are due to be dismissed under Rule 12(b)(6) to the extent they are premised on a DTPA cold kit product market/submarket.

### 3.     MDP & Sestamibi

Per the complaint, "MDP cold kits are used to prepare an imaging agent indicated for examining imperfections in a patient's bones. Using an MDP injection for bone scintigraphy is highly effective and, since the 1970s, it has been considered the primary choice for nuclear imaging of the skeletal system. The bone imaging capabilities of MDP are unique to the product. Pharmalucence currently manufactures a competing product." (Doc. 1, PageID.24, ¶¶ 84-86 (numbering omitted)). The Sestamibi cold "kit is used to prepare a myocardial perfusion agent indicated for detecting coronary artery disease and evaluating myocardial function." (*Id.*, ¶ 88).[30]

The undersigned finds that the Plaintiffs have failed to allege sufficient facts supporting a relevant product market consisting solely of either of these products. As with the DTPA cold kits, while the Plaintiffs conclusorily allege that MDP cold kits are the best product for conducting a certain type of test, they fail to

---

PageID.21, ¶ 68). Such conclusory allegations are insufficient on their own to plausibly plead a relevant product market, being reminiscent of the *Jacobs* plaintiffs' unadorned claim "that '[v]isco-elastic foam mattresses comprise a relevant product market, or sub-market, separate and distinct from the market for mattresses generally, under the federal antitrust laws[,]' " which the Eleventh Circuit found insufficient to plausibly allege a product market. 626 F.3d at 1338 (alteration added).

[30] Both brand name and generic Sestamibi cold kits are currently manufactured. (*See* Doc. 1, PageID.25, ¶¶ 89-90).

substantiate this claim with any specific factual allegations plausibly indicating that MDP cold kits are so unique or desirable compared to other products that perform the same function, such as the acknowledged competing product manufactured by Pharmalucence, that they should be considered their own discrete product submarket. As for Sestamibi cold kits, the Plaintiffs' allegations do not even hint that this product is somehow superior or unique when used in their relevant tests.[31] The Plaintiffs have otherwise failed to point to allegations plausibly suggesting other "practical indicia" limiting the relevant product market to either of these two products. For this reason, the Plaintiffs' federal antitrust claims are due to be dismissed under Rule 12(b)(6) to the extent they are premised on an MDP or a Sestamibi cold kit product market/submarket.[32]

---

[31] Indeed, in their initial response brief, the Plaintiffs point to factual allegations concerning MDP cold kits and Sodium Iodine I-131 that they claim "suggest[] these products are preferred by physicians over other products with similar functions[,]" but not for Sestamibi cold kits. (Doc. 50, PageID.322).

[32] The Plaintiffs argue that cross-elasticity of demand should not be a significant factor in determining the relevant product markets here because "this case does not involve the choices of retail consumers looking for ways to part with disposable income, but highly technical nuclear diagnostic and treatment products that are prescribed by doctors. Thus, unlike with many other types of products, decisions about their use are driven not by the idiosyncratic choices of consumers, or even, absent extreme circumstances, by economics; which procedure to administer (and which product to prescribe) is typically determined by doctors motivated by addressing the needs of their patients." (Doc. 50, PageID.319 (record citation omitted) (citing cases)). However, the cases cited by the Plaintiffs in support of this proposition reached their respective conclusions that physicians did not prescribe one kind of product over another based on price (thus supporting a finding that the products constituted separate markets) by relying on specific record evidence establishing that fact. They certainly do not stand for the proposition that such a fact should be assumed in all antitrust cases involving doctor-prescribed products, as the Plaintiffs appear to argue. The Plaintiffs point to no factual allegations in the

#### 4.     Sodium Iodine I-131 Solution

Per the complaint, "Sodium Iodine I-131 Solution is not a cold kit. Instead, it is a 'hot' radioactive therapeutic agent indicated for the treatment of hyperthyroidism and certain cases of thyroid cancer. I-131 radiotherapy has improved the survival rate of patients with differentiated thyroid cancers that have spread to the neck or other areas and has become the standard treatment for such cases … While JDI currently has the only FDA-approved Sodium Iodine I-131 on the market, International Isotopes Inc. distributes Sodium Iodine I-131 as a radiochemical grade product. In November 2016, International Isotopes submitted an Abbreviated New Drug Application to the FDA for a sodium iodide radiopharmaceutical product. While FDA approval is pending, International Isotopes is able to sell its sodium iodide radiochemical product. As a radiochemical product, International Isotopes' sodium iodide is not subject to certain FDA

---

complaint to plausibly suggest that doctors would act in such a manner for any of the Plaintiffs' claimed relevant market products, and such allegations cannot be supplied by way of the Plaintiffs' briefs in opposition to the present motion to dismiss. *See Walker v. Love's Travel Ctr.*, No. CV 17-0298-WS-M, 2017 WL 4931693, at *3 n.5 (S.D. Ala. Oct. 31, 2017) (Steele, J.) ("The plaintiff in her response asserts that she experienced 'a campaign of harassment and retaliation' and a 'hostile and almost intolerable work environment' created by her manager after she complained about the Confederate symbols in the workplace. No such allegations appear in the complaint, and a plaintiff may not amend her complaint through argument in a brief opposing dismissal." (record citation and case quotation omitted)). *Cf. also Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (per curiam) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."); *Campbell v. Air Jamaica Ltd.*, 760 F.3d 1165, 1168 (11th Cir. 2014) (even the leniency given to *pro se* pleadings "does not give a court license to serve as *de facto* counsel for a party, or to rewrite an otherwise deficient pleading in order to sustain an action" (quotation omitted)).

standards, however, the product has the same indications and uses as JDI's Sodium Iodine I-131 Solution." (Doc. 1, PageID.25, ¶¶ 92-93).

These allegations, accepted as true, plausibly plead a product market/submarket consisting of only Sodium Iodine I-131 Solution. Unlike with the DTPA, MDP, and Sestamibi cold kits, the Plaintiffs have alleged concrete facts plausibly indicating that Sodium Iodine I-131 Solution is more desirable and sufficiently unique over other potential substitute products such that it can be considered its own discrete product market – specifically, that I-131 radiotherapy has become "the standard treatment" for differentiated thyroid cancer because it has improved the survival rate of patients suffering from that condition. Accordingly, the undersigned finds that the Plaintiffs have sufficiently pleaded a market/submarket consisting of Sodium Iodine I-131 Solution, and JDI's motion to dismiss is due to be denied to the extent it claims otherwise.

### d.    Statute of Limitations

"Under the antitrust laws, 'a cause of action accrues and the statute [of limitations] begins to run when a defendant commits an act that injures the plaintiffs' business.' " *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 827 (11th Cir. 1999), *as modified*, 211 F.3d 1224 (11th Cir. 2000) (per curiam) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338, 91 S. Ct. 795, 28 L. Ed. 2d 77 (1971)). "A plaintiff must file his claim within four years following defendant's injurious act." *Id.* (citing 15 U.S.C. § 15(b)). Nevertheless, a statute of limitations is an affirmative defense, *see* Fed. R. Civ. P. 8(c)(1), and

generally "the existence of an affirmative defense will not support a motion to dismiss" unless a complaint's "own allegations indicate the existence of an affirmative defense…" *Quiller v. Barclays Am./Credit, Inc.*, 727 F.2d 1067, 1069 (11th Cir. 1984). However, a complaint is "not … vulnerable to dismissal simply because [the plaintiff] anticipated and attempted to negate [a] defense…" *Id.* Rather, dismissal is only appropriate if "the defense clearly appears on the face of the complaint." *Id.* (emphasis added).

JDI argues that the Plaintiffs' antitrust claims were filed outside of the 4-year statute of limitations to the extent they are based on either JDI's acquisition of the NDAs in 2013, or the price increase on MAA and DTPA cold kits in 2014, as the underlying injurious act. Indisputably, those actions occurred more than 4 years before the Plaintiffs filed their present antitrust complaint on August 12, 2019. However, the Plaintiffs argue that they can still bring antitrust claims involving those acts under the "continuing violation" rule.

"Suit may be brought more than four years after the events that initially created the cause of action only if the action is commenced within four years after the defendant commits (1) an overt act in furtherance of the antitrust conspiracy or (2) an act that by its very nature constitutes a "continuing antitrust violation." *Morton's Mkt.*, 198 F.3d at 827–28 (quoting *Zenith*, 401 U.S. at 338). As the Plaintiffs allege no antitrust conspiracy, they can only rely on the latter exception.

> An act constitutes a "continuing violation," if it injures the plaintiff over a period of time. Even though the illegal act occurs at a specific point in time, if it inflicts "continuing and accumulating harm" on a plaintiff, an antitrust violation occurs each time the plaintiff is injured by the act.

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 502 n.15, 88 S. Ct. 2224, 20 L. Ed. 2d 1231 (1968). For example, when sellers conspire to fix the price of a product, each time a customer purchases that product at the artificially inflated price, an antitrust violation occurs and a cause of action accrues. *Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 189, 117 S. Ct. 1984, 138 L. Ed. 2d 373 (1997). As a cause of action accrues with each sale, the statute of limitations begins to run anew.

> Antitrust law provides that, in the case of a "continuing violation," say a price fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, "each overt act that is part of the violation and that injures the plaintiff," e.g., each sale to the plaintiff, "starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times."

*Id.* 521 U.S. at 189, 117 S. Ct. 1984...

*Id.* at 828.

However,

[i]n interpreting the continuing violation rule established in *Zenith,* [the Eleventh Circuit] ha[s] stressed that "[i]t remains clear ... that a newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period, not merely the abatable but unabated inertial consequences of some pre-limitations action." *Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 128 (5th Cir. 1975) (remanding for additional factfinding about whether, during the limitations period, "there was some specific act or word precluding [plaintiff] from obtaining supplies from [defendant]."). In other words, "where a defendant commits an act injurious to plaintiff outside the limitations period, and damages continue to result from that act within the limitation period, no new cause of action accrues for the damages occurring within the limitations period because no act committed by the defendant within that period caused them." *Imperial Point Colonnades Condo., Inc. v. Mangurian*, 549 F.2d 1029, 1035 (5th Cir. 1977) (emphasis in original).

*Bray v. Bank of Am. Corp.*, 784 F. App'x 738, 741 (11th Cir. 2019) (per curiam) (unpublished).

The Plaintiffs have alleged that JDI's 2013 acquisition, and subsequent "warehousing" of, the NDAs directly led to the 2014 price hikes on MAA and DTPA cold kits, and that JDI has continued raising the prices on those products since. (Doc. 1, PageID.5, ¶¶ 11 – 13). Thus, under this version of events, every unlawfully high priced sale of these products resulting from those actions constitutes a separate antitrust violation subject to its own 4-year limitations period. However, the case law does not indicate that each of these continuing violations, even if timely brought within their own limitations periods, serve to revive claims based on the underlying illegal acts that occurred outside of their own limitations periods. Thus, while antitrust claims based on unlawful sales of the products occurring within 4 years of the complaint's filing would be timely, claims based on the 2013 NDAs acquisition, the 2014 price hike, and sales occurring earlier than 4 years prior to the complaint's filing would still be untimely. *See Klehr*, 521 U.S. at 189 (even in the case of a "continuing violation," "the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period"); *Zenith*, 401 U.S. at 339 ("[I]f a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date.

To recover those damages, he must sue within the requisite number of years from the accrual of the action.").

Nevertheless, the Supreme Court in *Zenith* also recognized "it is hornbook law, in antitrust actions as in others, that even if injury and a cause of action have accrued as of a certain date, future damages that might arise from the conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable." 401 U.S. at 339. "In antitrust and treble-damage actions, refusal to award future profits as too speculative is equivalent to holding that no cause of action has yet accrued for any but those damages already suffered." *Id.* Thus,

> [i]n these instances, the cause of action for future damages, if they ever occur, will accrue only on the date they are suffered; thereafter the plaintiff may sue to recover them at any time within four years from the date they were inflicted. Otherwise future damages that could not be proved within four years of the conduct from which they flowed would be forever incapable of recovery, contrary to the congressional purpose that private actions serve as a bulwark of antitrust enforcement, and that the antitrust laws fully protect the victims of the forbidden practices as well as the public...

*Zenith*, 401 U.S. at 339–40 (citations and quotations omitted).[33] The Plaintiffs also invoke this exception to the antitrust statute of limitations. Again, however, this

---

[33] *Accord City of El Paso v. Darbyshire Steel Co.*, 575 F.2d 521, 523 (5th Cir. 1978) ("The Fifth Circuit relied on *Zenith* in holding that under a certain circumstance acts which took place prior to the period of limitations can be 'revived' as a basis for later damages: 'That circumstance is the inability of the injured victim to earlier prove with requisite certainty the existence and amount of damages. In that circumstance it is a holding that in antitrust cases subsequent damages have not yet "accrued". They do not "accrue" until they can be reasonably established. The moment the victim can prove such subsequent damages, the statute begins to run

would not save antitrust claims premised on the premised on the 2013 NDAs acquisition or the 2014 price increase. Even accepting the argument that damages were overly speculative at the time of the NDAs acquisition because that acquisition "did not have an impact on JDI's pricing for MAA or DTPA" (Doc. 50, PageID.314), it cannot reasonably be argued that they stopped being so at the time of the 2014 price hike of the two products those NDAs could have competed against, as the difference between the pre- and post-NDA prices was readily ascertainable.

The Plaintiffs acknowledge that the 2014 price hike "certainly caused members of the Class *to pay more* for MAA and DTPA[,]" but claim "*at that time* it was not clearly the case that higher payments equated with violations of the Sherman Act, antitrust injury, or recoverable damages." (Doc. 50, PageID.314-315 (emphasis in original)). As the Plaintiffs' assert, it was only "JDI's [subsequent] purchase of Triad Isotopes and its roll out of the JDI Master Agreement" that "placed [the 2014 price hike] in proper context" and "made JDI's anticompetitive intent clear." (*Id.*, PageID.315). The undersigned, however, is not persuaded, and agrees with JDI that what the Plaintiffs are really claiming is speculative intent,

---

leaving four more years in which to assert them.' " (quoting *Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 456 F.2d 662, 667 (5th Cir. 1972)); *Imperial Point Colonnades Condo., Inc. v. Mangurian*, 549 F.2d 1029, 1034 n.14 (5th Cir. 1977) ("The Court [in *Zenith*] went on to hold that there is an exception to this rule in cases where the defendant committed the act causing injury more than four years before plaintiff commenced suit, but where damages resulting from the act could not have been proven with the requisite certainty until more than four years after commission of the act. In such cases, the Court held, the cause of action does not accrue until damages can be reasonably established. 401 U.S. at 339-42, 91 S. Ct. 795; *see Poster Exchange, Inc. v. Nat'l Screen Serv. Corp.*, 456 F.2d 662, 666-68 (5th Cir. 1972).").

rather than speculative damages – essentially, speculation over a cause of action itself, rather than damages. And even if the "speculative damages" rule could be said to apply to such a situation in principle, while those subsequent developments could certainly be said to have made JDI's alleged anticompetitive intent more pronounced, such intent was still reasonably ascertainable at the time of the 2014 price hike. Given that JDI's acquisition and "warehousing" of NDAs for potential competing products soon before, and its alleged intent was not so speculative that the Plaintiffs are entitled to claim they could only have ascertained it at a later date.[34]

---

[34]    The antitrust limitations period is subject to both statutory and equitable tolling. *See Morton's Mkt.*, 198 F.3d at 829-37. The Plaintiffs do not claim entitlement to statutory tolling, and they only briefly raise equitable tolling, based on fraudulent concealment, in a footnote. *See* (Doc. 50, PageID.315 n.8); *Morton's Mkt.*, 198 F.3d at 832 ("Fraudulent concealment … tolls the Clayton Act's statute of limitations.").

   "To avail themselves of [fraudulent concealment], plaintiffs have the burden of proving … that the defendants concealed the conduct complained of, and that plaintiffs failed, despite the exercise of due diligence on their part, to discover the facts that form the basis of their claim." *Morton's Mkt.*, 198 F.3d at 832 (quotation omitted). While generally "the issue of when a plaintiff is on 'notice' of his claim is a question of fact for the jury[,]" *id.*, equitable tolling may still be defeated as a matter of law "when it is shown that indisputably the plaintiffs 'had notice sufficient to prompt them to investigate and that, had they done so diligently, they would have discovered the basis for their claims.' " *Pac. Harbor Capital, Inc. v. Barnett Bank, N.A.*, 252 F.3d 1246, 1252 (11th Cir. 2001), *as amended* (July 3, 2001) (quoting *Morton's Mkt.*, 198 F.3d at 832). *See also Morton's Mkt.*, 198 F.3d at 836 ("Both the diligent and the non-diligent plaintiff are protected from the expiration of claims the factual basis for which was shrouded by the veil of fraudulent concealment. Neither, however, is protected from the expiration of claims the factual basis for which they could and should have discovered through the exercise of due diligence.").

   Here, the Plaintiffs do not claim that they were unaware of either the 2013 NDAs acquisition or the 2014 price hikes at the time they occurred. Rather, they simply cite to an article from the publication HealthImaging that they attach to their response brief, entitled *MAA price spike: Jubilant DraxImage address dodges*

Accordingly, the Plaintiffs' antitrust claims are due to be dismissed as time-barred under Rule 12(b)(6) to the extent they are based either the 2013 NDAs acquisition or the 2014 price hike as the underlying injurious act.

### e.    Tying Arrangement

"A tying arrangement is not illegal … simply because two products are sold together in the same package. The key to such an arrangement's anticompetitiveness (and thus its illegality) is the seller's ability to force buyers to purchase one product in the package, the tied product, by virtue of the seller's control or dominance over the other product in the package, the tying product." *Tic-X-Press, Inc. v. Omni Promotions Co. of Ga.*, 815 F.2d 1407, 1414 (11th Cir. 1987), *holding modified on other grounds by Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566 (11th Cir. 1991). "There are five elements in a [sic] anti-trust illegal tying claim: (1) two separate products, a 'tying' or 'desirable' product and a 'tied' or 'undesirable' product; (2) the buyer was in fact forced to buy the tied product to get

---

antitrust concern (Doc. 50-1, PageID.334-35) and allegedly "written shortly after JDI's first significant price increase of MAA and DTPA" (Doc. 50, PageID.315 n.8), in which JDI's vice president of sales explains away the 2014 price hike as necessary to address "the cost of manufacturing and utilization per vial [going] up and procedure volume [going] down," and the "difficulties of regulatory compliance[,]" along with an assurance that the 2014 price hike was "a one-time, exponential" occurrence. These statements, however, merely offered alternative explanations for JDI's alleged anticompetitive conduct, and had no effect of actually concealing any of it. Indeed, the very title of that article, along with its noting that the JDI VP's presentation was made to "pacify any accusation of wrongdoing on the part of JDI" (Doc. 50-1, PageID.334), indicates that the 2014 price hike actually did raise antitrust red flags at the time. In short, the Plaintiffs have failed to make even a colorable showing of entitlement to the fraudulent concealment doctrine, and as explained previously, it clearly appears from the face of the complaint that any antitrust claims premised on the 2013 NDAs acquisition and the 2014 price hike are time-barred.

the tying product; that is, a 'tying'; (3) the seller possessed sufficient economic power in the tying product market to coerce the buyer's acceptance of the tied product; (4) an anti-competitive effect in the tied product market; and (5) the involvement of a not insubstantial amount of interstate commerce in the tied product market." *Integon Life Ins. Corp. v. Browning*, 989 F.2d 1143, 1150 (11th Cir. 1993) (citing *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1502–03 (11th Cir. 1985)).

JDI asserts that, contrary to the Plaintiffs' allegations, the JDI Master Agreement contains no provision imposing a "tie," unlawful or not.[35] [36] In response,

---

[35] JDI, with the Court's leave (*see* Doc. 37), has submitted a copy of the JDI Master Agreement under seal with its motion to dismiss. (*See* Doc. 34 *SEALED*). Because that document is central to some the Plaintiffs claims, and because the Plaintiffs do not dispute its authenticity, the Court can consider it on a Rule 12(b)(6) motion to dismiss. *See Speaker v. U.S. Dep't of Health & Human Servs. Centers for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010) ("In … Rule 12(b)(6) dismissals, it is generally true that the scope of the review must be limited to the four corners of the complaint … This Court, however, has recognized an important qualification to this rule where certain documents and their contents are undisputed: In ruling upon a motion to dismiss, the district court may consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged." (quotations omitted)).

[36] JDI also argues that Count II is deficient because the complaint fails "to allege the necessary element that the 'tied' products that they were allegedly forced to buy—I-131, and MDP and Sestamibi cold kits—are products they did not want, or would have purchased elsewhere but for the alleged 'tie.' " (Doc. 36, PageID.255). However, as JDI's own brief points out, "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, *or might have preferred to purchase elsewhere on different terms.*" *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12, 104 S. Ct. 1551, 80 L. Ed. 2d 2 (1984) (emphasis added), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 126 S. Ct. 1281, 164 L. Ed. 2d 26 (2006). Construed in the light most favorable to the Plaintiffs, the complaint's allegations plausibly suggest that the Plaintiffs at least might have preferred to purchase those products elsewhere on different terms.

the Plaintiffs concede that the JDI Master Agreement does not contain an *explicit* tying provision, but argue that an explicit contractual provision is not necessary to maintaining an unlawful tying arrangement claim if there is evidence the arrangement is enforced by other means. While the Plaintiffs have cited case law supporting this premise,[37] they fail to cite to any specific factual allegations plausibly suggesting the other means by which the purportedly unlawful tying arrangement is enforced. In addressing this argument, the Plaintiffs cite only to paragraphs 119 and 121 of the complaint (*see* Doc. 50, PageID.325), which state:

> Beginning with the 2017 JDI Master Agreement, JDI has unlawfully tied the sale of its Sole-Source Products to the sale of its Multi-Source Products. More precisely, JDI requires nuclear pharmacies that want to purchase MAA and DTPA cold kits to purchase 100% of their annual Sodium Iodine I-131 need from JDI. JDI also coerces nuclear pharmacies to make an annual minimum purchase commitment of

---

[37] *See Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 267 (6th Cir. 2015) ("A tying arrangement can be prohibited under § 1 of the Sherman Act even if the tie is not explicit in the seller's contracts, but instead is enforced through informal constraints or pricing policies."); *Tic-X-Press*, 815 F.2d at 1416-17 ("Where a contract or franchising agreement provides that buyers shall use only the seller or a source 'approved' by the seller to purchase the tied product, the courts have looked to see if the approval clause was reasonable and permitted the buyer meaningful freedom of choice, or whether it is manipulated by the seller to force the buyer to purchase the tied product from the seller … Although the district court determined that the language of the approval clause in this case gave promoters the right to request approval of another ticket agency, it also found that no promoter had ever requested permission to use another ticket agency, notwithstanding the approval clause, because they understood through years of dealing with TOPCOL and using the Agreement that they were required to use SEATS. Furthermore, it also found that the appellants had never approved another ticket agency and that they had never established written standards and procedures for approving other agencies. Given these findings, it is reasonable to conclude that the approval clause was somewhat bogus under the circumstances present in this case and that promoters did not have meaningful freedom of choice in the tied market." (citations and footnote omitted)).

MDP cold kits and/or Sestamibi cold kits by withholding discounts off the list price of its other products.

…

In order to secure JDI's Sole-Source Products—MAA and DTPA cold kits— nuclear pharmacies are required to buy JDI's non-sole source products Sodium Iodine I-131, MDP, and Sestamibi, and they are forced to buy these products at inflated prices.

(Doc. 3, PageID.94-95, ¶¶ 119, 121 (numbering omitted)). Particularly given the Plaintiffs' concession that the JDI Master Agreement does not contain an explicit tying provision, its conclusory allegations that JDI has "unlawfully tied the sale of" its products, "coerces" purchases, and has "forced" companies to buy products are the sort of bare labels and conclusions that a court is not required to accept as true when deciding a Rule 12(b)(6) motion.

For this reason, Count II is due to be dismissed under Rule 12(b)(6).

### f.    Willful Conduct

" 'The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.' " *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1293–94 (11th Cir. 2004) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S. Ct. 1698, 1704, 16 L. Ed. 2d 778 (1966)). JDI's present motion addresses only the second element, arguing that the Plaintiffs' monopoly claims in Counts I (concerning MAA

and DTPA markets) and III (concerning MDP and Sodium Iodine I-131 markets) should be dismissed for failure to plausibly allege willful conduct.

"The second element requires predatory or exclusionary acts or practices that have the effect of preventing or excluding competition within the relevant market. In order for a practice to be exclusionary, it must harm the competitive *process* and thereby harm consumers. Harm to one or more *competitors* will not suffice for a § 2 violation." *Id.* at 1294 (citations and quotations omitted).

The undersigned agrees with the Plaintiffs that their allegations regarding JDI's 2013 acquisition, followed by price hikes on MAA and DTPA, is sufficient to plausibly show "willful" conduct supporting their Count I monopoly claims. By hiking the prices of MAA and DTPA, products for which JDI was the sole supplier, after acquiring and then "warehousing" NDAs for potential competing products, JDI can plausibly be said to have engaged in "exclusionary acts or practices that ha[d] the effect of preventing or excluding competition" within the MAA and DTPA markets. JDI's arguments that the Plaintiffs should be required to allege more to show "willful" conduct supporting Count I are neither supported by binding authority nor persuasive. Accordingly, JDI's motion to dismiss is due to be denied as to Count I to the extent it argues a failure to plausibly allege "willful" conduct.

However, the undersigned does not agree with the Plaintiffs that their allegations regarding the tying arrangement purportedly imposed by JDI Master Agreement are sufficient to plausibly show "willful" conduct supporting their Count III monopoly claim. The undersigned does not foreclose the possibility allegations of

a tying arrangement could still be evidence of "willful" conduct even if they do not separately support a claim for an *unlawful* tying arrangement. Here, as noted above, the Plaintiffs have conceded the JDI Master Agreement does not contain an explicit tying provision, contrary to what their complaint strongly implied, and they have not alleged any other specific, non-conclusory facts plausibly suggesting that a tying arrangement was enforced by other means. The Plaintiffs also point to no other allegations in the complaint plausibly indicating "willful" conduct by JDI in allegedly monopolizing the MDP and Sodium Iodine I-131 markets. For this reason, Count III is due to be dismissed under Rule 12(b)(6).

### g.    "Dangerous Probability of Success"

Count IV alleges attempted monopolization claims for the MDP, Sodium Iodine I-131, and Sestamibi markets. "In order to prove an attempt to monopolize claim under § 2, a plaintiff must show that (1) the defendant has engaged in predatory or anticompetitive conduct, (2) the defendant engaged in such conduct with the specific intent to monopolize, and (3) there existed a dangerous probability that the defendant might have achieved monopoly power." *Tech. Res. Servs., Inc. v. Dornier Med. Sys., Inc.*, 134 F.3d 1458, 1466 (11th Cir. 1998) (citing *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 113 S. Ct. 884, 890–91, 122 L. Ed. 2d 247 (1993); *U.S. Anchor Mfg.*, 7 F.3d at 993). JDI's present motion concerns only the third element as applied to the Sestamibi market, claiming that the Plaintiffs have

failed to plausibly allege a dangerous probability of achieving monopoly power over it.[38]

"To adequately plead dangerous probability of achieving monopoly power, the plaintiff must allege that the defendant is close to achieving monopoly power in the relevant product market. Monopoly power is the power to raise prices to supra-competitive levels or the power to exclude competition in the relevant market either by restricting entry of new competitors or by driving existing competitors out of the market." *Duty Free Americas*, 797 F.3d at 1264 (citation and quotations omitted). "Most attempts to measure monopoly power involve quantifying the degree of concentration in a relevant market and/or the extent of a particular firm's ability to control productive capacity in that market. In analyzing attempted monopolization's dangerous probability of success element, the estimate of market power is necessarily speculative to some extent because it requires an evaluation of future behavior by market participants, viewed at the time the alleged attempt began. [Courts] are not without guideposts, however. []Relevant determinants of the market power of a prospective predator in this regard include its absolute and relative market shares, and those of competing firms; the strength and capacity of current competitors; the potential for entry; the historic intensity of competition; and the impact of the legal or natural environment." *U.S. Anchor Mfg.*, 7 F.3d at 994. Nevertheless, "the principal judicial device for measuring actual or potential

---

[38] Count IV also alleges attempted monopolization of the MDP and Sodium Iodine I-131 markets. JDI's "dangerous probability" arguments do not address those markets.

market power remains market share, typically measured in terms of a percentage of total market sales." *Id.* " '[A] dangerous *probability* of achieving monopoly power may be established by a 50% share' of the relevant market." *Duty Free Americas*, 797 F.3d at 1264 (quoting *U.S. Anchor,* 7 F.3d at 1000).

As JDI points out, and the Plaintiffs concede, while the Plaintiffs do allege JDI's market share for MDP and Sodium Iodine I-131 – 74% and 64%, respectively, as of June 30, 2016 (Doc. 1, PageID.47, ¶ 182), they do not allege it for Sestamibi. The Plaintiffs cite to paragraphs 96 – 101 of the complaint (Doc. 1, PageID.26-27; Doc. 3, PageID.88-89) as proof that they "have alleged facts showing that barriers to entry made competition difficult in this market." (Doc. 50, PageID.329). However, those paragraphs consist of either conclusory allegations claiming significant barriers (*see* Doc. 1, PageID.26, ¶¶ 96-97 ("There are significant barriers to entry in the relevant markets, including patent and other regulatory protections and high costs of entry and expansion … In a 2018 earnings call, JDI's ultimate parent company, JLS, publicly acknowledged the high barriers to entry in the radiopharmaceuticals industry. When asked whether there was impending competition for JDI's products, CEO of JPL, Pramod Yadav, responded: 'This business, as you may be aware, has quite a high entry barrier.' "), or more specific information about products other than Sestamibi. And even accepting the premise that there are substantial barriers to entering the Sestamibi market, it is undisputed that others manufacture this product as well, and the Plaintiffs' allegations fall short of plausibly showing that JDI is "close to achieving monopoly

power" in this market. For this reason, Count IV is due to be dismissed under Rule 12(b)(6) to the extent it alleges an attempted monopolization of the Sestamibi market.[39]

### h.   Unjust Enrichment

The Count VI unjust enrichment claim is based on JDI's fractionation prohibition. JDI's sole argument in favor of dismissing the under Rule 12(b)(6) is that, because the fractionation prohibition arises from a provision in the JDI Master Agreement, the Plaintiffs cannot assert an unjust enrichment theory based on this same prohibition, since under Alabama law, unjust enrichment is a claim in which "the law implies a contract," *Am. Family Care, Inc. v. Fox*, 642 So. 2d 486, 488 (Ala. Civ. App. 1994), "claims of both an express and an implied contract on the same subject matter are generally incompatible[,]" and "where an express contract exists between two parties, the law generally will not recognize an implied contract regarding the same subject matter." *Kennedy v. Polar-BEK & Baker Wildwood P'ship*, 682 So. 2d 443, 447 (Ala. 1996) (per curiam).

Assuming without deciding that the foregoing principles, or Alabama substantive law in general, applies to the unjust enrichment claim here, the undersigned agrees with the Plaintiffs that, under Federal Rule of Civil Procedure 8(d)(3), they are permitted to plead such a claim regardless of any inconsistency

---

[39] As the undersigned previously found, all of the Plaintiffs' antitrust claims premised on the Sestamibi product market are also due to be dismissed for failure to plausibly allege the contours of that market, and Count IV is also due to be dismissed for failure to identify a "willing and able competitor" for any relevant market.

with the alleged existence of an express contract. *See* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."); *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1273–74 (11th Cir. 2009) ("Rule 8(d) of the Federal Rules of Civil Procedure expressly permits the pleading of both alternative and inconsistent claims. Thus, UTC's complaint is not subject to dismissal simply because it alleges that both Mazer, individually, and West–Hem committed the tortious conduct, even if it would be impossible for both to be simultaneously liable (which question of impossibility we need not, and do not, resolve)." (footnote omitted)); *Brookhaven Landscape & Grading Co. v. J. F. Barton Contracting Co.*, 676 F.2d 516, 523 (11th Cir.), *adhered to*, 681 F.2d 734 (11th Cir. 1982) (per curiam) (Under predecessor to Rule 8(d), "[l]itigants in federal court may pursue alternative theories of recovery, regardless of their consistency … A party may not, however, recover separately on inconsistent theories when one theory precludes the other or is mutually exclusive of the other.").[40] Accordingly, JDI's motion is due to be denied as to Count VI.

### i.  Leave to Amend

The Plaintiffs primarily request that the Court deny JDI's motion to dismiss. However, the last sentence of the Plaintiffs' response brief states that, "[i]n the alternative, pursuant to Federal Rule of Civil Procedure 15(a) (2), Plaintiffs seek the

---

[40] Most of the district court opinions that JDI cites in support of its assertion that an unjust enrichment claim must be dismissed at the pleading stage if the existence of an express contract is also alleged, fail to acknowledge Rule 8(d) or related authority, and none of those cases persuade the undersigned to depart from the plain text of Rule 8(d)(3) permitting a party to plead claims "regardless of consistency."

Court's leave to amend their Complaint." (Doc. 50, PageID.331). This lone sentence is unaccompanied by any specific argument supporting such relief in either the Plaintiffs' response or sur-reply.

Eleventh Circuit caselaw is clear that, "[w]here a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly." *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1222 (11th Cir. 1999) (per curiam). Instead, "[f]iling a motion is the proper method to request leave to amend a complaint[, and a] motion for leave to amend should either set forth the substance of the proposed amendment or attach a copy of the proposed amendment." *Long v. Satz*, 181 F.3d 1275, 1279 (11th Cir. 1999) (per curiam). In the ten months that JDI's motion to dismiss has been pending, the Plaintiffs have never filed a proper motion for leave to amend. The Eleventh Circuit has upheld a district court's denial of leave to amend where, as here, "[t]he request for leave to amend was included in the memorandum … filed in opposition to the motion to dismiss[,]" the memorandum "failed to attach the amendment or set forth the substance of the proposed amendment[,]" and the "plaintiff had ample time to file a motion for leave to amend but failed to do so." *Id.* at 1280-81.[41]

---

[41] *Accord, e.g.*, *Rosenberg v. Gould*, 554 F.3d 962, 967 (11th Cir. 2009); *My24HourNews.com, Inc. v. AT&T Corp.*, 791 F. App'x 788, 803 (11th Cir. 2019) (per curiam) (unpublished) ("[R]ather than file a motion for leave to amend, My24 included its request in the memorandum filed in opposition to AT&T's motion to dismiss. Even assuming that request was the functional equivalent of a motion, My24 failed to attach the proposed amendment or set forth the substance of the proposed amendment, as required by *Long* … My24 simply requested 'leave to amend to cure any defects.' That is not enough, and the district court acted within its discretion by denying the embedded request for amendment."); *Avena v. Imperial*

Accordingly, the undersigned will recommend that the Plaintiffs' request for leave to amend the complaint embedded within their response brief be denied.[42]

## V.   *Conclusion & Recommendation*

In accordance with the foregoing analysis, and pursuant to 28 U.S.C. § 636(b)(1), Federal Rule of Civil Procedure 72(b)(1), and S.D. Ala. GenLR 72(a)(2)(S), the undersigned hereby **RECOMMENDS** as follows:

1. that JDI's motion to dismiss (Doc. 35) be **GRANTED** as to dismissal under Rule 12(b)(6) of the claims in Counts I, II, III, and IV of the complaint (Doc. 1), as well as the claims in Count V to the extent they are based on (a) DTPA, MDP, and Sestamibi product markets, and (b) either the 2013 NDAs acquisition or the 2014 price hike of MAA and DTPA as the underlying injurious act;

---

*Salon & Spa, Inc.*, 740 F. App'x 679, 683 (11th Cir. 2018) (per curiam) (unpublished) ("Here, the only request Avena made for leave to file an amended complaint prior to the district court's dismissal of her complaint was a single line at the end of her motion in opposition to Imperial's motion to dismiss. This request was improper because it neither contained a proposed amendment, nor did it elaborate on the substance of the proposed amendment.").

[42] Undercutting the possibility that the Plaintiffs have any new material information to add to the complaint is the fact that they did not take advantage of the opportunity to amend their complaint once as a matter of course under Federal Rule of Civil Procedure 15(a)(1)(B) to at least attempt to address any of the myriad issues raised in JDI's motion. *See* Fed. R. Civ. P. 15(a) advisory committee's note to 2009 amendment (Under Rule 15(a), "the right to amend once as a matter of course terminates 21 days after service of a motion under Rule 12(b), (e), or (f). This provision will force the pleader to consider carefully and promptly the wisdom of amending to meet the arguments in the motion. A responsive amendment may avoid the need to decide the motion or reduce the number of issues to be decided, and will expedite determination of issues that otherwise might be raised seriatim. It also should advance other pretrial proceedings.").

2. that JDI's motion to dismiss (Doc. 35) be otherwise **DENIED**; and

3. that the Plaintiffs' request for leave to amend their complaint embedded within their response brief (Doc. 50, PageID.331) be **DENIED**.

**DONE** this the 18th day of September 2020.

*/s/ Katherine P. Nelson*
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within 14 days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. GenLR 72(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.